IN

# THE SUPREME COURT

OF

## THE STATE OF MISSOURI,

### OCTOBER TERM, 1869, AT ST. LOUIS.

---

### WM. GRUMLEY, Appellant, v. WM. G. WEBB, Respondent.

1. *Equity — Agent — Purchase of property of principal by, forbidden.* — An agent can not be allowed to purchase an interest in property where he has a duty to perform which is inconsistent with the character of a purchaser. The law does not presume that such a transaction will always be impressed with fraud, but it furnishes an inducement to fraud, and affords opportunities to persons, who should always act with the most conscientious and scrupulous good faith, to abuse their trust; and therefore a total disability is enjoined, to take away all temptation.

2. *Equity — Agent, while in fiduciary capacity, can not interfere with title to the trust property.* — An agent who, for a certain remuneration, undertook to collect the rents and exercise control over the property of his principal while the latter was absent and relied entirely on his discretion, judgment and integrity, had no right to interfere with the title to the property, or place himself in an attitude of antagonism to the interests of his principal. By purchasing the property under such circumstances, he made himself liable as a trustee in relation thereto, for the benefit of his principal.

3. *Equity — Sale — Purchaser — False representations by — Constructive trusts.* — Where one becomes a purchaser under such circumstances as would make it a fraud to permit him to hold on to his bargain — as, by representing that he is buying for the benefit of the embarrassed debtor in the execution, or that

he intended to reconvey the property, and thereby obtained it at a sacrifice—courts will relieve against such fraud, and the person who has gained an advantage by means of such fraudulent act will be converted into a trustee for those who have been injured thereby. (McNew v. Booth, 42 Mo. 189.)

4. *Equity—Leasehold estate—Trustee—Renewal of lease in name of—Profits, to whom accounted for.* —Where a trustee in charge of a leasehold estate obtained a renewal of the lease of his *cestui que trust* in his own name, before the lease had expired, and the possession and title which he had got by reason of his being agent or trustee superinduced the execution of the lease to him, he will be obliged to assign it to the *cestui que trust*, and account for the profits.

5. *Equity — Lease — Renewal of by trustee in his own name — New lease held in trust for person entitled to original lease.*—A lease renewed by a trustee or executor in his own name, even in the absence of fraud, and upon a refusal of the lessor to grant a new lease to the *cestui que trust*, will be held in trust for the person entitled to the old lease, on the ground of public policy, in order to prevent persons in such situations from acting so as to take a benefit for themselves.

6. *Evidence — Receipt — General and particular terms, how construed.*—A receipt given in full satisfaction of a certain judgment therein specified, and also of "all claims and demands," will not avail against another suit pending between the same parties, and not shown to have been intended by them to be included in the receipt. Language, however general in its form, when used in connection with a particular subject matter, will be presumed to be used in subordination to that matter, and will be construed and limited accordingly.

*Appeal from St. Louis Circuit Court.*

*Nathaniel Myers*, and *Oliver*, with whom were *Cline, Jamison & Day*, for appellant.

I. The equitable title to the lease is in Grumley. 1. Webb's permitting Grumley's improvements to remain on the land for his own benefit, was a fraud upon Grumley's rights. His procuring the sheriff's deed of January 31, 1857, was a gross fraud in law and in fact upon his principal, Grumley. His retaining possession under that deed, excluding Grumley, refusing to account for rents, and forcing Grumley to sue him, were also gross frauds on Grumley's rights. And it was because Webb suffered the buildings to remain, and because he had a seeming title, and because he had possession, that he was enabled to get the lease now in controversy. 2. When a new lease is granted, the old one is considered to be still in being. The new lease is considered a graft

upon the old. Whoever is entitled to the profits of the old lease is entitled also to those of the new. (Rawe v. Chichester, 1 Ambler, 719; Randall v. Russell, 3 Merivale, 195; Taster v. Marriott, 1 Ambler, 668; Eyre v. Godolphin, 1 Ball & B. 299; Holridge v. Gillespie, 2 Johns. Ch. 29; Rakestraw v. Brewer, 2 Pierre W. 512.) 3. The agency of the defendant estopped him, under any circumstances, from getting a new lease for himself. (Zilkin v. Carhart, 3 Bradf., N. Y., 376; Phyfe v. Wardell, 5 Paige's Ch. 279; Tanner v. Elworthy, 4 Beav. 491.) The ground of decreeing renewals by trustees to inure to the benefit of the infant is public policy, to prevent persons in such situations from acting so as to take a benefit to themselves. (Griffin v. Griffin, 1 Sch. & Lefr. 352; Owen v. Williams, 1 Ambler, 734; Bennett v. Vansyckel, 4 Duer, 462; Davoue v. Fanning, 2 Johns. Ch. 251; Pickering v. Vowles, 1 Brown's Ch. 182; Fitzroy v. Howard, 3 Russ. Ch. 233; Featherstonhaugh v. Fenwick, 17 Ves. Jr. 298; Van Horn v. Fonda, 5 Johns. Ch. 409; Huson v. Wallace, 1 Richardson's Eq. 2–7; Whalley v. Whalley, 1 Vern. 484; Mulvaney v. Dillon, 1 Ball & B. 417; 2 Fonblanque's Eq. 189.) 4. It matters not that there was no covenant of renewal contained in the old lease. The right to the new lease is not based on covenant. It results from the relation of the parties — from the "beneficial interest connected with a tenancy as an inducement toward a renewal." (Zilkin v. Carhart, *supra*.) "Though the lessors are not bound to renew, yet, when done, it is a continuation of the old lease." (Rawe v. Chichester, 1 Ambler, 719; Owen v. Williams, *supra*; Pickering v. Vowles, 1 Brown's Ch. 182; Griffin v. Griffin, *supra*; Eyre v. Godolphin, 1 Ball & B. 299; Davoue v. Fanning, *supra*; Bennett v. Vansyckel, *supra*.) 5. The policy of the law prohibits a trustee from getting a new lease to himself, although the lessor refuses to renew to the *cestui que trust*. (Bennett v. Vansyckel, *supra*; Keech v. Sandford, 3 Eq. Cas. Abr. 741; Davoue v. Fanning, *supra*; Lead. Cas. in Eq., Hare & Wall. Notes, pp. 84, 97.)

II: The plaintiff Grumley has never in any way parted with his equitable interest in this new lease. 1. Webb has no writing sufficient, under the statute of frauds, to show such transfer.

The only writing the defendant has is a receipt for the judgment alone. The receipt itself includes nothing else. The sweeping clause " in full of all claims and demands " is to be restrained and limited by the previous special recital of the " judgment." A general release is to be taken most strongly against the releasor ; but where there is a special recital, and then general words follow, the general words are to be restrained and qualified by the special recital. (Bac. Abr. 633 ; Sto. on Agency, §§ 21, 62, 65, 66, 74 ; Sto. on Cont. § 642 *et seq.* ; Chit. on Cont. 84 ; 2 Pars. on Cont. 220 ; Add. on Cont. 845 ; Fox on Cont. 155 ; Powell on Cont. 235–6 ; Swift's Dig. 300 ; Jackson v. Stackhouse, 1 Cow. 122 ; Lyman v. Clark *et al.*, 9 Mass. 237 ; McIntire v. Williamson, 1 Edw. Ch. 34 ; Payne v. Allen, Sprague, 304 ; Averill v. Lyman, 18 Pick. 346 ; Rich v. Lord, 18 Pick. 346 ; Van Hagen v. Van Rensselaer, 18 Johns. 420 ; Elmendorf v. Lansing, 5 Cow. 470 ; Payler v. Homersham, 4 Maule & Selw. 425 ; Ramsden v. Hylton, 2 Ves. Sr. 309 ; Cole v. Gibson, 1 Ves. Sr. 505 ; Thorpe v. Thorpe, 1 Raymond, 235 ; Cole v. Knight, 3 Mod. 277 ; Butcher v. Butcher, 4 Bos. & Pul. 113 ; Simons v. Johnson, 3 Barn. & Ald. 180 ; Bruen v. Marquand, 17 Johns. 58 ; Littlefield v. Winslow, 19 Maine, 397 ; Rossiter v. Rossiter, 8 Wend. 494 ; Hays v. Goldsmidt, cited in 1 Taunt. 349 ; Hoes v. Van Hoesen, 1 Barb. Ch. 398 ; Taylor v. Robinson, 14 Cal. 399 ; Washburn v. Alden, 5 Cal. 463.) 2. The defense is seeking to extend the receipt by parol. Even if they had a right to do this, it would yet be incumbent on them to show, by direct and positive testimony, that the matter in regard to which they wish to introduce parol evidence was expressly mentioned, and that, too, in the way of bargain and sale ; and it being an interest in land, a transfer of which they are seeking to prove by parol, they must prove it (if at all) by indubitable proof of the contract in all its parts.

*Krum, Decker & Krum,* for respondent.

I. The plaintiff, by his petition and proofs, seeks to raise a constructive trust and fasten it on the conscience of the defendant, and convert him into a trustee for the plaintiff *quoad* the

Grumley v. Webb.

property in question. To raise a constructive trust, the burden rests on the plaintiff to show that the acquisition, by defendant, of the lease of John O'Fallon for a term of ten years from January 1, 1864, was effected with fraud. He has failed to show this.

II. In order to raise a constructive trust, it is essential that three things be made to appear, viz : 1. That the plaintiff had a right to, or property or interest in, the subject matter of the trust. 2. That the defendant, at the time of the transaction, stood in a fiduciary relation to the plaintiff or the property. 3. That the defendant, in his fiduciary capacity, had control of the subject matter, and by reason of such control obtained the property to his own use. The evidence establishes neither of these propositions.

III. The settlement made March 7, 1865, set up in the answer, is a full and complete defense to this action. The plaintiff, by his receipt, acknowledged the sum paid ($6,500) to be in full satisfaction of all claims and demands which he then had or held against the defendant. The language used in the receipt is the most comprehensive known in the law. " 'Demand' is a word of most extensive import, and a release of all demands discharges all manner of actions existing at the time." (4 Den. 166.) That settlement included all damages the plaintiff had sustained by reason of the alleged wrongs of the defendant in respect to the leasehold property, and the receipt is a good bar to any subsequent action for damages, and also a bar to a suit in equity for the title. (Hughes v. Moore, 7 Cranch, 178 ; Swift's Dig. 300.)

WAGNER, Judge, delivered the opinion of the court.

This was a bill in equity to have a renewed lease, procured by the defendant while agent of the plaintiff, declared a trust for the plaintiff, and for an account. The record shows that the plaintiff leased from John O'Fallon an unimproved lot of ground in 1844, and in 1855 completed the building of fifteen houses on it. The lease was to expire January 1, 1864, with a privilege in plaintiff of removing his improvements at any time before its expiration. Just before completing the building of the houses, the plaintiff, by

a power of attorney, made defendant, who was in the real estate business, his agent to collect the rents and manage his property, and then departed for Europe. While plaintiff was absent, the defendant, his agent, bought in three judgments for himself, which were outstanding against the plaintiff. Upon these judgments he caused executions to be issued, had the fifteen houses levied on, and sold at sheriff's sale, and bought them in himself, taking a deed therefor, while plaintiff was absent in Europe. The sale was made in January, 1857, and the evidence is uncontradicted that bidders were kept away and competition warded off by defendant's declaring that he was purchasing the buildings for his principal, the plaintiff. The buildings were purchased at sheriff's sale, and, as the evidence shows, for less than a tenth of their real value. The defendant stated on different occasions that he purchased the buildings for the plaintiff, but it seems that he really bought them for himself, with the intention of keeping them; and when plaintiff, on hearing of the sale, returned home, he refused to give him any account of the rents of the houses except up to the time of the sheriff's sale to him. Plaintiff then sued defendant, as his agent, for an account, and in May, 1864, recovered a judgment for $11,522.54, for rents collected and appropriated by defendant up to January 1, 1864, the date that the lease expired.

In the month of November, 1863, and before the expiration of the lease, both parties (the plaintiff and defendant) applied to the lessor for a renewal of the lease. The lessor, O'Fallon, refused to continue the lease to the plaintiff, but granted a lease of the premises for ten years from January 1, 1864, to the defendant; and he has ever since enjoyed the rents and profits of the lot, together with the buildings thereon erected by the plaintiff.

O'Fallon is dead, but the testimony of Keber, his chief clerk, a disinterested witness, states that he knew of no objection to the plaintiff, but that O'Fallon made it a rule to grant a new lease to the one already in possession. The defendant was in possession, to the exclusion of his principal, the plaintiff; he exhibited his deed to show title, and it is charged that he made use of his wrongful possession and pretended title to acquire his lease.

After the procurement of this lease by the defendant, and at the September term, 1864, of the St. Louis Circuit Court, the plaintiff brought suit against the defendant for $7,000, in which he set up that under the first lease he had a right to remove the improvements at any time before the 1st of January, 1864, and that the defendant refused to let him remove them after that date, thereby damaging him in the above amount, for which he asks judgment. A demurrer was filed and sustained to this last petition. While this last suit was pending, and the prior judgment remained unsatisfied, negotiations were entered into for a compromise. It appears that an appeal was taken from the judgment as rendered, and it was agreed by the attorneys on both sides that there was a mistake in the calculation as to amount, and that it was rendered for too much. They finally agreed on six thousand five hundred dollars, and the plaintiff executed to the defendant the following receipt:

"Received from William G. Webb six thousand five hundred dollars, which is in full satisfaction of a judgment recovered by me against said Webb and David S. Bigham, in the St. Louis Circuit Court; and said sum is in full satisfaction of all claims and demands I have or hold against said Bigham and Webb, or either of them, up to this date.

"(Signed)                                  WILLIAM GRUMLEY.

"ST. LOUIS, *March* 7, 1865."

It should be stated that Bigham was in partnership with defendant Webb in the real estate business when the plaintiff intrusted his business to their care, but they dissolved partnership before plaintiff's return from Europe, and the whole matter passed into the hands of the defendant, who alone was sued in this suit.

Upon the facts as above set forth, the case was heard in the court below, and the bill dismissed for want of equity.

It is contended by the counsel for the plaintiff that the defendant, at the time he acquired the lease, stood in a fiduciary capacity, and was disabled from taking and holding the same on his own account, and that it inured in equity to plaintiff's benefit.

Grumley v. Webb.

Defendant's counsel insists that the lease in controversy did not inure to the benefit of the plaintiff upon its procurement, and that, if it did, the receipt shows a settlement of all matters in difference between the parties, and includes this as well as all other claims.   Nothing is better settled than that an agent or a trustee, or any person acting in a fiduciary capacity, can not speculate for his private gain with the subject matter committed to his care, to the prejudice of his principal.   He can not be allowed to purchase an interest in property where he has a duty to perform which is inconsistent with the character of purchaser.   The law does not presume that such a transaction will always be impressed with fraud, but it furnishes an inducement to fraud, and affords opportunities to persons, who should always act with the most conscientious and scrupulous good faith, to abuse their trust; and therefore a total disability is enjoined, to take away all temptation. (Jamison v. Glascock, 29 Mo. 191; Boardman v. Florez, 37 Mo. 559; Jacques v. Edgell, 40 Mo. 77; Thornton v. Irwin, 43 Mo. 153; State, etc., v. McKay, 43 Mo. 594.)

Lord St. Leonards, in his work on vendors and purchasers, lays down the rule with great clearness.   He says: "It may be laid down as a general proposition that trustees, who have accepted the trust (unless they are nominally such to preserve contingent remainders), agents, commissioners of bankrupts, assignees of bankrupts or their partners in business, solicitors to the commission, auctioneers, creditors who have been consulted as to the mode of sale, counsel, or any persons who, being employed or concerned in the affairs of another, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under the restrictions which will be shortly mentioned. For if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not to exercise it for the benefit of the persons relying on their integrity.   The characters are inconsistent.   *Emptor emit quam minimo potest, venditor vendit quam maximo potest.*" (Sugd. on Vend. and Pur., 13th ed., 566.)

In New York it has been decided that the clerk of a broker

employed to make sale of land, who has access to the correspondence between his principal and the vendor, stands in such a relation of confidence to the latter that if he becomes the purchaser he is chargeable as trustee for the vendor, and must reconvey or account for the value of the land. (Gardner v. Ogden, 22 N. Y. 325.)

That the defendant in this case occupied a relation of trust and confidence toward the plaintiff is undisputed. For a certain remuneration he undertook to collect the rent and exercise control over the property. His principal was absent, and relied entirely on his discretion, judgment, and integrity. Under such circumstances he had no right to interfere with the title to the property, or place himself in an attitude of antagonism to the interests of his principal. But this is not all. It was expressly agreed that the rents, as they were collected, after paying taxes and ground-rent, should be applied to the payment of the judgments. But, instead of pursuing this course, the defendant, as agent, purchases up the judgments, has them assigned to him, orders out execution, and buys the property in his own name. This, too, while the plaintiff was in Europe, relying on the defendant's honesty and diligence to protect his rights. That the deed was taken in the defendant's name, and that he afterward refused to account for rents beyond the time that he acquired the deed, shows that the purchase was made *ex maleficio*. Had there been no agency, under the facts in this case, the defendant would still have been placed in the position of a trustee. He obtained the property at a sacrifice, by representing that he was buying for his principal; and no principle is clearer than that where one becomes a purchaser under such circumstances as would make it a fraud to permit him to hold on to his bargain — as by representing that he is buying for the benefit of the embarrassed debtor in the execution, or that he intended to reconvey the property, and thereby obtains it at a sacrifice — courts will relieve against such fraud, and the person who has gained an advantage by means of such fraudulent act will be converted into a trustee for those who have been injured thereby. (McNew v. Booth, 42 Mo. 189, and cases referred to.)

We think, then, the proposition may be fairly stated that at the time the purchase was made, at sheriff's sale, the defendant was disabled from acting on his own account, and that for whatever he did he will be held liable as a trustee.

When he acquired the lease from O'Fallon he was dealing as a trustee; and he obtained a renewal of the lease of his *cestui que trust* in his own name before the lease had expired; and the evidence leaves no room to. doubt that the possession and title which he had got by reason of his being agent or trustee were the agencies which superinduced the execution of the lease to him.

A uniform series of decisions, both English and American, have adjudged that under such circumstances the trustee can not take the lease to himself; and if he does, he will be obliged to assign it to the *cestui que trust*, and account for the profits. The·leading case on this question is Keech v. Sandford (Selw. Cas. in Ch. 61), which was tried in 1726, before Lord Chancellor King. In that case, a person being possessed of a lease of the profits of a market, devised his estate to a trustee in trust for the infant. · Before the expiration of the term the trustee applied to the lessor for a renewal for the benefit of the infant, which he refused, in regard that, it being only of the profits of the market, there could be no distress, and must rest singly in covenant, which the infant could not do.

There was clear proof of the refusal to renew for the benefit of the infant, and the trustee then got a lease made to himself. Bill was brought by the infant to have the lease assigned to him, and for an account of the profits, on the principle that wherever a lease is renewed by a trustee it shall be for the benefit of the *cestui que use*. This principle was not denied in the argument for the trustee, but it was endeavored to be avoided on the ground of the express refusal of the lessor to renew to the infant. But the Lord Chancellor said: "I must consider this as a trust for the infant, for I very well see that if a trustee, on the refusal to renew, might have a lease to himself, few trust estates would be renewed to *cestui que use*. Though I do not say there is fraud in this case, yet he (the trustee) should rather have let it run out than to have had the lease to himself. This may seem hard, that

the trustee is the only person of all mankind who might not have the lease; but it is very proper that the rule should be strictly pursued, and not in the least relaxed; 'for it is very obvious what would be the consequences of letting trustees have the lease on refusal to renew to *cestui que use.*' "

And a decree was accordingly entered that the lease should be assigned to the infant, and that the trustee should be indemnified from any covenant comprised in the lease, and that an account should be taken of the profits made after the renewal.

Keech v. Sandford, sometimes called the Rumford Market case, is cited by the learned authors of the Leading Cases in Equity (see White & T. Lead. Cas. in Eq., 36) as the leading authority on the doctrine of constructive trusts arising upon the renewal of a lease by a trustee or executor in his own name and for his own benefit.

The rule inflexibly laid down by Lord King has been invariably followed, namely: that a lease renewed by a trustee or executor, in his own name, even in the absence of fraud, and upon the refusal of the lessor to grant a new lease to the *cestui que trust*, shall be held upon trust for the person entitled to the old lease. For this position the authors cite the following cases: Fitzgibbon v. Scanlan, 1 Dow, 261, 269; Rawe v. Chichester, 1 Amb. 715; 1 Bro. Ch. C. 198; 2 Dick, 480; Pickering v. Vowles, 1 Bro. Ch. C. 198; Pierson v. Shore, 1 Atk. 480; Nesbitt v. Tredennick, 1 Ball & B. 46; Abney v. Miller, 2 Atk. 597; Edwards v. Lewis, 3 Atk. 538; Killick v. Flexney, 4 Bro. Ch. C. 161; Moody v. Mathews, 7 Ves. 174; James v. Dean, 11 Ves. 383; Parker v. Brooke, 9 Ves. 583; Lovatt v. Knipe, 12 Ir. Eq. Rep. 124; Walley v. Walley, 1 Vern. 484; Holt v. Holt, 1 C. C. 190.

The reason assigned for decreeing renewals by trustees and executors, to inure to the benefit of the *cestui que trust*, is public policy, to prevent persons in such situations from acting so as to take a benefit for themselves. (Griffin v. Griffin, 1 Sch. & L. 354, per Lord Redesdale; Blewett v. Millet, 7 Bro. P. C. 367, Toml. ed.)

The same doctrine applies to partnerships, where one partner obtains a renewal of a partnership lease for his own benefit, and

to a person having a limited interest in a renewable lease, as a tenant for life. If he renews it in his own name, he will be held trustee for those entitled in remainder in the old lease.

In American jurisprudence the principle is equally as well settled as in England. In an early day, the ablest of all American chancellors (Kent) gave the subject a thorough and profound discussion, and fixed the rule on a strong basis. It would too much extend the length of this opinion to attempt a review of the American authorities, but they will be found collated by the American editors, Hare & Wallace, in a note to Keech v. Sandford, above referred to.

In the case of Zilkin v. Carhart (3 Bradf. 376), the intestate having owned a lease for years, without covenant of renewal, but with a stipulation that the right of the lessee to take away the building on the premises should not be impaired, and the administratrix having taken a renewal in her own name, it was held that the new lease inured to the benefit of the estate, and that the administratrix was bound to account to the next of kin for its value and for the rents which had accrued, less the current charges, repairs, and ground-rent.

The surrogate, in his opinion, said there was always a beneficial interest connected with a tenancy as an inducement toward a renewal, which in equity was regarded as valuable; and a trustee could not avail himself of his position, and use the good-will for a renewal in his own right, in exclusion of the parties for whom he was trustee. (See, also, Thomas v. Zumbalen, 43 Mo. 471.)

In general, however, where the trustee buys an estate, or renews a lease which inures to the benefit of the *cestui que trust*, he will be entitled to reimbursement for his outlay. (Quackenbush v. Leonard, 9 Paige, 334, 344; Mathews v. Dragaud, 3 Desau. 25–8; McClanahan v. Henderson, 2 Marsh. 388; Morrison v. Caldwell, 5 Monr. 426; Kellogg v. Wood, 4 Paige, 578.)

One question alone remains to be considered, and that is whether the receipt concludes this suit, and amounted to a final adjustment of all matters in controversy between the parties. The plaintiff alone signed the receipt, and it expressed full satisfaction of the judgment, which was the principal object of nego-

tiation between the parties, and also of all claims and demands which the defendant had or held against the plaintiff. The language is exceedingly broad and comprehensive, but, like all other contracts, it must be interpreted and construed from existing facts, and in the light of surrounding and cotemporaneous circumstances. Evidence was taken at the trial in the court below as to what was actually settled between the parties, and what was intended to be released. Some of the evidence is in conflict and irreconcilable. The opposing attorneys understand the matter differently. But upon a review of all the evidence bearing upon this point, and the statement of the parties themselves, the conclusion is irresistible that the plaintiff thought he was compromising only the judgment actually obtained, and that he was receiving satisfaction and releasing his claim to that judgment only. He had no idea that the settlement included the second suit, which was pending and undisposed of in the Circuit Court.

The receipt, acknowledging satisfaction of the judgment rendered, he signed; and on the same day his attorneys, on their own responsibility, and without consulting him, signed an order for the dismissal of the pending suit. It is undoubted that he was ignorant of this dismissal for some time after it occurred. On the other hand, the defendant's testimony tends to show that defendant considered the settlement a complete adjustment of all differences growing out of plaintiff's claim on defendant; but I am impelled to the belief that neither party at the time apprehended that a suit of this character would be instituted. It was not contemplated nor thought of. Such being the case, we must see what construction the law will place upon the terms of the receipt.

In the case of Vedder v. Vedder (1 Den. 257), where the receipt was "one dollar in full of all demands to date," Judge Beardsley quoted the language of Lord Coke, that the word "demand" was the largest word in law except "claim," and said that a "release of all demands discharges all sorts of actions, rights and titles, conditions before or after breach, executions, appeals, rents of all kinds, covenants, annuities,

contracts, recognizances, statutes, commons," etc.; and, as authorities to sustain this view, he cites Bac. Abr., tit. Release, I; Litt. § 508; Co. Litt. 291, *b*; Edward Althan's case, 8 Rep. 299. But the receipt in that case was simply for one dollar in full of all demands to date, nothing being said respecting the particular demand which was paid; and, as it was received on an adjustment between the parties of mutual cases of tort, it was held to be binding on all cases of mutual dispute. The case, when properly examined and rightfully understood, does not militate against the universally-recognized doctrine that language, however general in its form, when used in connection with a particular subject matter, will be presumed to be used in subordination to that matter, and will be construed and limited accordingly.

In an old book of great merit it is said: " On the rule of law that every man's deed shall be taken strongest against himself, and on what is laid down in Althan's case (8 Coke, 148) *generalis clausula*," etc., " it hath been insisted that general words in a release are to be taken strongest against the releasor, and are not to be qualified or restrained by any special recital. But herein the sure rule and distinction seems to be that where there are general words all alone in a deed of release they shall be taken more strongly against the releasor; but where there is a particular recital in a deed, and then general words follow, the general words shall be qualified by the particular recital." ( Bac. Abr., tit. Release, K. )

In 2 Roll. Abr. 409, it is said that if a man receives £10 of another, and by his deed acknowledges the receipt thereof, and therefore releases, acquits, and discharges him of all actions, suits, debts, duties, and demands, by this release nothing is discharged but the £10, and the action and demands thereof; for the last words have reference to the first, and are so limited by them.

In Jackson v. Stackhouse (1 Cow. 122) the release given in evidence by the defendant discharged the judgment obtained against the mortgagors for two years' interest on the bond; it also contained general words: " in full of all debts, demands,

judgments, executions, and accounts, of whatsoever nature, in law or equity." Notwithstanding the extensive scope of this language, the court declared that it was settled that where there were general words alone in a deed of release they should be taken most strongly against the releasor; but where there was a particular recital, and then general words followed, the general words should be qualified by the particular recital. So, also, in Littlefield v. Winslow (19 Maine, 394), Shepley, J., in speaking on this subject, says: "Persons often use general language when speaking of the subject on which the mind is then employed. If another subject be presented to the mind in connection with it, the language usually gives some indication of it. And when it does not, if general language were not limited to the subject then under consideration, it would occasion mischiefs not only in the common business of life, but in the construction of contracts, and even in judicial proceedings. It was so clearly perceived that the language used should be considered as applicable to the subject of thought only, that it introduced the maxim, '*sensus verborum ex causa dicentis accipiendus est et secundum subjectum materiam.*'" (S. P. Moore v. Magrath, Cowp. 9, per Lord Mansfield; Butcher v. Butcher, 4 Bos. & Pul. 113; Payler v. Homersham, 4 Maule & S. 425; Lyman v. Clark, 9 Mass. 237; McIntire v. Williamson, Edw. Ch. 38.)

It necessarily follows that the receipt furnishes no obstacle to the plaintiff's asserting his rights in this suit. The judgment will be reversed and the cause remanded for further proceedings, to be had in conformity with this opinion.

Reversed and remanded. The other judges concur.