## KIMBALL v. RANNEY.

1. PRINCIPAL AND AGENT — MORTGAGE FORECLOSURE — PURCHASE OF PRINCIPAL'S PROPERTY BY AGENT.

An agent for the sale of real estate has no right to bid it in for himself at a sale on foreclosure of a mortgage thereon, and, if he does so, equity will require him to account therefor to his principal; and the rule is not altered by the fact that he notified the principal, several days prior to the sale, of his intention to purchase on his own behalf.

2. SAME—RATIFICATION—ESTOPPEL.

The fact that the principal obtained an order for a resale of the premises, and afterwards, being unable to comply with the conditions of the order, or to effect a settlement with the agent, accepted the surplus moneys arising from the sale, and

then waited from three to four years before proceeding against the agent for an accounting, does not amount to a ratification of the sale, or estop the principal from claiming that it inured to his benefit.

3. SAME—LACHES.

Nor is he precluded from obtaining relief because of his laches, where his rights in the premises were at all times denied by the agent.

4. SAME—ACCOUNTING—INTEREST.

In accounting for the proceeds of the transaction, however, the agent should be allowed interest on his disbursements.

Appeal from Wayne; Frazer, J. Submitted October 27, 1899. Decided December 2, 1899.

Bill by James E. Kimball against Frederick T. Ranney and George W. Balch for an accounting and an injunction. From a decree against defendant Ranney alone, both he and complainant appeal. Modified.

*George W. Bates*, for complainant:

. Ranney was disqualified to purchase in his own name while acting as agent for Kimball. 2 Sug. Vend. & P. (8th Amer. Ed.) 406; 2 Pom. Eq. Jur. §§ 959, 1052; 1 Story, Eq. Jur. § 316; Adams, Eq. 61, and cases cited; Greenh. Pub. Pol. 300; *Ingerson* v. *Starkweather*, Walk. Ch. 346; *Walton* v. *Torrey*, Har. Ch. 259; *Clute* v. *Barron*, 2 Mich. 192; *People* v. *Township Board*, 11 Mich. 226; *Green* v. *Knoch*, 92 Mich. 26; *Ford* v. *Wright*, 114 Mich. 122; *Tyler* v. *Sanborn*, (Ill.) 4 L. R. A. 218, and note; *Church* v. *Insurance Co.*, 1 Mason, 341; *Grumley* v. *Webb*, 44 Mo. 444; *Adams* v. *Sayre*, 70 Ala. 318; *Martin* v. *Wyncoop*, 12 Ind. 266; *Newcomb* v. *Brooks*, 16 W. Va. 32. And the notice given by him to Kimball did not operate to terminate the agency. *Bowman* v. *Officer*, 53 Ia. 640; *Bartholemew* v. *Leech*, 7 Watts, 472; *Fountain Coal Co.* v. *Phelps*, 95 Ind. 271; *Michoud* v. *Girod*, 4 How. 503.

Complainant is not chargeable with laches. *Boyce* v. *Danz*, 29 Mich. 146; *Allore* v. *Jewell*, 94 U. S. 506.

To constitute a ratification, the acts relied upon must have been done with knowledge of the law as well as the

facts. 1 White & T. Lead. Cas. p. 237 *et seq.;* 2 Lewin, Tr. 926; 1 Story, Eq. Jur. § 345; 2 Pom. Eq. Jur. § 964; 2 Perry, Tr. § 851; *Murray* v. *Palmer,* 2 Sch. & L. 474; *Crowe* v. *Ballard,* 2 Cox, Ch. 253; *Cockerell* v. *Cholmeley,* 1 Russ. & M. 418; *Wood* v. *Downes,* 18 Ves. Jr. 120; *Dunbar* v. *Tredennick,* 2 Ball & B. 304; *Strange* v. *Fooks,* 4 Giff. 408; *Hoffman Coal Co.* v. *Cumberland Coal Co.,* 16 Md. 456; *Mulford* v. *Minch,* 11 N. J. Eq. 16; *Rosenberger's Appeal,* 26 Pa. St. 67; *Campbell* v. *McLain,* 51 Pa. St. 200; *Boyd* v. *Hawkins,* 2 Dev. Eq. 195; *Butler* v. *Haskell,* 4 Desaus. 651.

*Gray & Gray (Edwin F. Conely,* of counsel), for defendants:

Under the circumstances, there was no disability on the part of Ranney to purchase. *Beedle* v. *Crane,* 91 Mich. 429; *Rochester* v. *Lovering,* 104 Ind. 562.

At most, the purchase was only voidable (Story, Agency, § 210; *People* v. *Township Board,* 11 Mich. 229; *Hoyt* v. *Latham,* 143 U. S. 566; *Marsh* v. *Whitmore,* 21 Wall. 178; *Bank* v. *Taylor,* 41 Ala. 100), and as such has been ratified (*Jewett* v. *Petit,* 4 Mich. 508; *Wilbur* v. *Flood,* 16 Mich. 40; *Brown* v. *Miller,* 63 Mich. 413; *Gridley* v. *Tobacco Co.,* 71 Mich. 528; *Bresnahan* v. *Ross,* 103 Mich. 483; *Oil Co.* v. *Marbury,* 91 U. S. 591; *Grymes* v. *Sanders,* 93 U. S. 55; *Hayward* v. *Bank,* 96 U. S. 611; *Pence* v. *Langdon,* 99 U. S. 578; *Mackall* v. *Casilear,* 137 U. S. 556; *Hammond* v. *Hopkins,* 143 U. S. 250; *Hoyt* v. *Latham,* Id. 567; *Hyatt* v. *Clark,* 118 N. Y. 563; *Scott* v. *Freeland,* 15 Miss. 409; *Bassett* v. *Brown,* 105 Mass. 551; *Eckrote* v. *Myers,* 41 Iowa, 324; *Pridgen* v. *Adkins,* 25 Tex. 388).

HOOKER, J. Heath owned certain real estate in the city of Detroit, upon which were two mortgages, aggregating about $17,000. Ranney, a real-estate agent, was employed by Heath to sell the property, for which he was to receive a commission. There was talk between them that the value of the property would be increased if the council of the city could be induced to fix the location of a proposed street upon this property. Heath became pecuniarily involved, and on June 16, 1893, deeded the property to his father-in-law, Kimball. Kimball testified

that the consideration for this deed was $1, and that he paid some taxes upon the property, amounting to $82. He said that there was no bargain, and that the deed was made by Heath and handed to him, and that he supposed he did it to keep it away from creditors, and that he held it for Heath's benefit. On April 28, 1894, at Heath's direction, Kimball signed a contract with Ranney, whereby, "in consideration of services rendered in effecting the sale" of the property, it was agreed that Ranney should receive a commission of 2 per cent. upon a sale of the property for $22,500, and one-half of any sum received in excess of that price. Ranney was to pay "all expenses or costs of any kind incurred in the sale of said property, and also one-half of any assessment for paving or sidewalk that may be assessed against unsold portion of said property, when said assessment shall become due and payable; said advances being intended as part of the consideration of this contract."

The mortgage held by the Citizens' Savings Bank was in process of foreclosure in chancery, and a sale of the premises thereunder was advertised for July 14, 1894. On July 11, 1894, Ranney wrote the following letter, which Kimball admits receiving:

"DETROIT, July 11, 1894.

"CHARLES J. HEATH and MR. KIMBALL.

"*Gentlemen:* Since my interview with you, I have made up my mind to protect my contract interests in your Woodward-avenue property to the best of my ability at the sale to take place on July 14th inst., particularly as you expressed yourselves unable or unwilling to do so. I shall therefore buy the property, if I can. If I get it, I wish you would come and see me. I may be able to help you.                    Yours respectfully,

"F. T. RANNEY."

Kimball testified that he learned of this proposed sale, from Heath, upon the 9th of July, and immediately called upon Ranney, and told Ranney that he could not get the sale "off" (we suppose that he meant "postponed"), and asked Ranney why he did not do it, and stated that he

was his agent to take care of the property; and that Ranney did not make much reply, except that he had made an effort but could not do it. Subsequently Kimball received the letter mentioned above. Kimball then made an unsuccessful effort to get the bank to postpone the sale. The testimony shows that this could have been accomplished if he would have paid some of the interest due. At the sale, Ranney bid in the property, subject to the other mortgage, for about $40 more than the amount due and costs. Kimball saw him after the sale, and told him he supposed he had purchased it in his (Kimball's) interest as well as his own; and he said, "Oh, no; that is my property now;" and that he did not intend to divide it with them (i. e., Kimball and Heath). Kimball then said, "Haven't I got any time to redeem the property?" and Ranney, after talking over the telephone to Mr. Gray, solicitor for the complainant in the foreclosure proceeding, reported that he had eight days. Ranney procured the money to pay for the property from his father-in-law, Mr. Balch, and gave him a deed of the property by way of security. He subsequently obtained from him money with which he paid the other mortgage, by giving him additional security. Kimball thereupon employed counsel and made an application for a resale, and this was granted upon condition that Ranney should be paid $500 for his services (i. e., interest in the property under the contract), and that a deposit should be made to secure a promised bid for the property. These conditions were not complied with, and finally an order of confirmation was entered under a stipulation reading as follows:

"It is hereby stipulated and agreed that, in the foreclosure proceedings of the Citizens' Savings Bank, referred to in the record in this cause (file No. 13,565 of the circuit court for the county of Wayne, in chancery), James E. Kimball, on August 25, 1894, filed a petition for the payment to him of the surplus moneys, of $40.35, in court, a copy of which is hereto attached, and that on the same day an order directing such payment was entered, a copy of which is also hereto attached, and that on the same

day said surplus was paid to him, and that the same should be considered and read in evidence upon the hearing of this cause, as if the same appeared in the return now on file."

As shown by the stipulation, Kimball received the surplus paid for the land by Ranney, amounting to $40 or more.

The street-opening matter finally passed the council, and proceedings to condemn the land commenced late in the fall of 1894, according to Ranney's testimony. A year or so later, proceedings were begun by Ranney against the city, and these were finally settled in this court in his favor. On July 23, 1895, a portion of the property was sold to Mrs. Davis for $8,500; and on May 30, 1896, Ranney sold his equity in the property to Balch, upon a settlement of their affairs. The bill in this cause was verified February 10, 1898, and asks an accounting by Ranney, and an injunction against the selling or incumbering of the premises by Ranney or Balch. The circuit court granted the relief prayed against Ranney, and dismissed the bill as to Balch. Both complainant and defendant Ranney have appealed.

The learned circuit judge found that the contract did not require Ranney to see that the property was not sold upon the mortgages, but it was his opinion that the relation which he sustained to the property was such as to forbid its purchase upon his own behalf, to the exclusion of the complainant, and to make him a trustee for the benefit of the complainant when he acquired title. It is admitted that one who contracts to sell property for another cannot purchase for himself; but counsel assert that this is not such a case, for the reason that he did not sell to himself, or, indeed, sell at all, and that he purchased at a sale which he was powerless to avert, and only did so to protect himself against loss.

The doctrine invoked by the complainant goes further than to merely forbid a purchase by an agent from himself, and extends to all cases where the purchase by an

agent may be an inducement to omit a duty regarding the subject of the purchase. In *Grumley* v. *Webb*, 44 Mo. 444, it was held that an agent cannot be allowed to purchase an interest in property where he has a duty to perform which is inconsistent with the character of a purchaser. In that case the agent took a lease to himself, instead of a renewal of a former lease to his principal. In *Martin* v. *Wyncoop*, 12 Ind. 266, it was held that an administrator could not purchase real estate of his testator at a sheriff's sale, for himself or another, even though it was sold on an execution in his favor levied before he assumed the trust, and although it appeared that he used efforts to make the property sell for the best price possible. The case of *Fountain Coal Co.* v. *Phelps*, 95 Ind. 271, affirms the doctrine. In *Adams* v. *Sayre*, 70 Ala. 318, Adams was Sayre's agent having control and possession of mortgaged premises, and performing the duty of managing and renting them, etc., and was his authorized agent to sell the property. He purchased the property at a foreclosure sale, and it was held that his relation was a fiduciary one as regarded the property, and that he was not permitted to traffic with the subject-matter of his agency, without the consent of his principal, so as to reap a profit for himself. It was said, "The appellant was the agent of the mortgagor to sell the property, and this relationship imposed on him the manifest duty of obtaining for it the highest available price."

In *Newcomb* v. *Brooks*, 16 W. Va. 32, it was laid down as a general principle that "a person who occupies any fiduciary relation to another is bound not to exercise for his own benefit, and to the prejudice of the party to whom he stands in such relation, any of the powers or rights, or any knowledge or advantage of any description, which he derives from such confidential relation," and that a purchase under such circumstances could be set aside by the principal at his pleasure, without any inquiry as to adequacy of price or fairness of the transaction. This is upon the principle stated by Lord Eldon (*Ex parte Lacey*, 6 Ves. 627), that:

" Though you may see in a particular case that he [the trustee] has not made advantage, it is utterly impossible to examine, upon satisfactory evidence in the power of the court (by which I mean in the power of the parties), in ninety-nine cases out of a hundred, whether he has made advantage or not. \* \* \* The probability is that a trustee who has once conceived such a purpose will never disclose it, and the *cestui que trust* will be effectually defrauded."

Mr. Justice Wayne said in *Michoud* v. *Girod*, 4 How. 555:

."The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interests of the other, from the faithful discharge of which duty his own personal interests may withdraw him. In this conflict of interest the law wisely interposes. It acts not on the possibility that in some cases the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty of trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests when he is the seller or buyer on his own account are directly conflicting with those of the person on whose account he buys or sells."

In the case of *Newcomb* v. *Brooks, supra,* it was said further that:

" This rule is not confined to trustees and fiduciaries, in the technical meaning of the words, but it extends to every person who is within the reason of the rule,—that is, to every person who by his connection with another

person, or who by being employed or concerned in his affairs, has acquired a knowledge of his property; and any such person occupying such confidential relation to another comes within the rule we have laid down. In other words, the rule embraces every relation in which there may arise a conflict between the duty which the purchaser owes the person with whom he is dealing and his own individual interest."

Numerous authorities are there cited. in support of the rule. It was held that:

"A fiduciary cannot make a valid purchase of the trust property, though it be made at a public judicial sale under a decree made in an adverse proceeding. Any such purchase may be avoided, at his option, by any party to whom he holds such fiduciary relation."

See *Ford* v. *Wright*, 114 Mich. 122.

It is urged in behalf of the defendant that all of these cases involve elements of fraud; but it is evident that the decisions were not based upon findings of actual fraud, but rest upon the more solid and sweeping proposition that a trustee cannot deal to his own advantage with the trust fund without the consent of the *cestui que trust*. Subjected to the test of this rule, we think that Ranney had no right to purchase this land, to the exclusion of the complainant, because he had duties that were incompatible with it. He was bound to sell this property as speedily and as advantageously as possible. As a purchaser, his interest was to buy as cheaply as possible. Whether yielded to or not, the impending foreclosure sale, at which he might purchase, presented a temptation to omit the performance of these duties, and delay action until the property should become his, whereby he, and not Kimball, would reap the profit arising from a sale. There is evidence in the case, by both Heath and Kimball, that defendant led them to expect, if he did not promise, that he was able to, and would, protect the title for their mutual benefit. At a late day he informed them that he could not; yet in a very few days afterwards he obtained the

money which would have protected it, by taking title and giving security upon the property. It cannot be denied that he gave complainant notice that he would purchase the property for his own benefit, while there was yet 12 or 13 days within which he might have redeemed, but he was unable to do it. We think it did not change the relations, or make the title valid, any more than it would have done had he given him that period to redeem after a confirmation of a purchase made without complainant's knowledge. The edge is sought to be taken from the rule by the claim that Ranney found it necessary to do this for the protection of his rights under the contract. His rights under the contract consisted of a prospective commission, to earn which he had made effort, and possibly expended some money, though the latter does not appear. But the sequel has shown, what must have been apparent then, that he could safely have taken care of his own rights without depriving the complainant of his.

Kimball obtained an order for a resale, and finding that he could not comply with the conditions, or that it would not pay him to do so, took the surplus of the purchase price, and then waited three or four years before instituting proceedings. It is contended that these things amount to a recognition of Ranney's rights, and a ratification of the sale, and that in any event his laches should estop him from making this claim. The record shows that 'complainant tried to adjust this matter satisfactorily. He applied for a resale in the hope that he could save something from the property after his vain effort to effect a redemption within the short period allowed. He sent his attorney to Ranney, offering to pay the amount of his bid and $100 additional for the redemption of the property, but was refused. After the sale was confirmed, he or his counsel took the money remaining after payment of the mortgagee, but for this he is ready to account. We think these things do not estop him from claiming that Ranney bought the property for their mutual benefit. Ranney has not relied upon, or been misled or injured by, them.

Nor do we think the defense of laches should prevail.

Ranney was under no obligation to buy this property. He professes to have done so for his own benefit, but so does any agent who buys his principal's land with a view to profit. At all events, he bought it, and the law says that he purchased for the benefit of his *cestui que trust.* Ordinarily a purchase with such design is meritorious, and the trustee is only required to give the *cestui que trust* the proceeds. But here there was no such design, and, upon the contrary, the trustee has set up, and at all times maintained, an unlawful claim. He now says, in effect, that such gratuitous interference gave him the right to say to complainant: "I now have a deed of your property. You must at once relieve me of this burden which I have voluntarily assumed, or your laches will make my title perfect." We do not take this view of the matter. For his own purposes, Ranney chose to take the property, trusting to his ability to realize from it. He did not ask complainant to relieve him from his burden. On the contrary, he denied his right to do so, and refused the offer made by complainant's solicitor, which appears to have been made in good faith, and in the belief that it could be performed. He told complainant the land was his, subject to a right to redeem within eight days. When asked if he "would send complainant to the poorhouse," he replied that "business is business." Thereupon he was allowed to sell the property, and complainant now asks the court to give him the trust fund. We concur in the opinion of the circuit court that he is entitled to what is left after reimbursing Mr. Ranney. In addition to the items allowed Mr. Ranney by the decree, we think that he is entitled to interest upon his disbursements, the amount of which should be deducted from the amount of decree. The decree of the circuit court will be modified in this particular, and in other respects affirmed. As the record contains no computation of the amount to be deducted for interest, it will be determined on the settlement of the decree, if counsel do not sooner agree upon it. The defendant will recover costs of this court.

The other Justices concurred.