GROVER GODWIN, Respondent, v. ROBERT W. GRAHAM, Appellant, ISAAC GRAHAM, Defendant.

GROVER GODWIN, Respondent, v. ROBERT W. GRAHAM ET AL., Defendants, ROBERT W. GRAHAM, Appellant, Nos. 41110 and 41246—228 S. W. (2d) 789.

Division One, March 13, 1950.

Motion for Rehearing or Modification of Opinion Overruled, April 10, 1950.

*Green, Hennings, Henry & Evans* and *Shifrin & Shifrin* for appellant; *John R. Green II* and *Gideon H. Schiller* of counsel.

420

*Clarence M. Barksdale* and *Jackson F. Adams* for respondent.

CLARK, P. J.—Respondent sued appellant and many others alleging, in substance, that he had an option to purchase the Park Manor Hotel in St. Louis for the sum of $149,000.00; that appellant, in writing, agreed to either purchase the hotel through respondent for $168,750.00 or to go into partnership with respondent in the purchase of it; that appellant failed to perform this agreement and fraudulently, in conspiracy with others, permitted respondent's option to be forfeited and purchased the hotel for his own account in fraud of respondent and contrary to the agreement. The petition prayed equitable relief declaring respondent to be a partner in the title, for the appointment of a receiver and for an accounting.

Appellant's answer and cross-bill admitted the execution of the agreement; denied that respondent had a valid option; denied that appellant was guilty of fraud or conspiracy; alleged that respondent had obtained the agreement by misrepresentation, and that it was void; that respondent was estopped by having terminated the agreement and that respondent had an adequate remedy at law. The answer and cross-bill prayed for the dismissal of the petition; that the court try and determine title and vest the same in appellant.

Appellant's father, Isaac Graham, was a defendant and filed a general denial.

All defendants except appellant and Isaac Graham were dismissed. The case went to trial against appellant and his father, resulting in a decree finding defendants guilty of fraud, declaring respondent to be a partner in the title, appointing a receiver and requiring defendants to make an accounting. Isaac Graham did not appeal.

The record of the trial is long and replete with conflicting testimony, but out of the maze of contradictions and discrepancies the following facts emerge. From and after June, 1942, respondent had an option or contract to purchase the hotel and had deposited with the corporation owner or its agent the sum of $5,000.00 as earnest money. This contract, originally procured for respondent by a real estate agent named Willson, was amended from time to time by mutual consent until on April 27, 1943, and for many months prior thereto it stated a total purchase price of $149,000.00, or $144,000.00 above respondent's deposit. During much of this time appellant, through his agent, Klein, had been negotiating with respondent for the purchase of the hotel.

The time for closing respondent's option was extended from time to time. Appellant's evidence indicates that this was due in part at least to the inability of respondent to procure the necessary financing. Other reasons were that respondent was in the Army and absent from St. Louis; also a suit was pending by the lessees against the hotel company which alone was sufficient to prevent closing the deal until April 24, 1943, when that suit was settled. Whatever caused the delay, the evidence is overwhelming that respondent's option was in force on the morning of April 27, 1943. On the afternoon of that day appellant bought the hotel on his own account.

In the spring of 1943 representatives of the hotel company were pressing for a speedy settlement with respondent. Appellant's evidence is that April 27 had been set as the definite and final date for closing, although respondent testified that Glaeser, one of the company's agents, had assured him of a reasonable time after that date. This was denied by the agent.

In April, 1943, respondent was a Captain in the Army and appellant was a Lieutenant in the Navy and both were stationed in or

near Washington, D. C. On April 24, appellant called on respondent at his office in the Pentagon Building and they entered into the following agreement:

"Agreement."

"April 24, 1943."

"It is agreed between Grover Godwin and Robert W. Graham that the said Robert W. Graham will deposit immediately with the Lawyers Title Company in St. Louis, Missouri, the sum of Thirty Thousand Dollars ($30,000.00), of which Twenty-Five Thousand Dollars ($25,000.00) is to be paid to the Metropolitan Trust Company of Chicago, Illinois, as part purchase of the Park Manor Apartment Building at 5560 Pershing Avenue, St. Louis, Missouri, and Five Thousand Dollars ($5,000.00) will be returned to the said Grover Godwin. The said Robert W. Graham may have the option to purchase the said property from Grover Godwin for the sum of One Hundred Sixty-Eight Thousand Seven Hundred Fifty Dollars ($168,-750.00) and to pay said Grover Godwin all cash or, in place of all cash, to give Grover Godwin a second deed of trust in the sum of Fifteen Thousand Dollars ($15,000.00) to be payable Five Hundred Dollars ($500.00) a month in principal with six percent interest, subject to a first deed of trust which the said Robert W. Graham will procure and pay for in the amount not to exceed One Hundred Twenty-Five Thousand Dollars ($125,000.00), interest and principal to be not more than Twelve Thousand Dollars ($12,000.00) a year, or said Robert W. Graham may have the right to elect to go into partnership with the said Grover Godwin in the ownership of said property, and each will endeavor to secure financing, in this event said Grover Godwin to be repaid expense money of Twenty-Two Hundred Dollars ($2,200.00) and property to be financed by a first and second deed for as much as possible, and for the balance a third deed of trust in the sum of Thirty Thousand Dollars ($30,000.00) or less to be given to said Robert W. Graham. The equity above these three mortgages to be held jointly by said Grover Godwin and Robert W. Graham.

s/ Grover Godwin.
s/ Robert W. Graham."

Respondent assisted in obtaining leave for appellant and priority for him on a plane to St. Louis. Appellant, with the above agreement in his pocket, boarded a plane that day, but was delayed at Pittsburgh and did not arrive in St. Louis until the next day, Sunday, April 25. On Sunday afternoon he sent the following telegram to respondent:

"In order to protect the deposit must have seller's assurance of time extension and reasonable guarantees from lenders of necessary financing. Advise at once."

Respondent replied by wire as follows:

"Wired Chicago 25,000 deposit with Lawyers Title in accord with our agreement. Suggest you contact Chicago for extension which Glaeser promised. Have another cash offer $165,000 which will protect your deposit. Also wired Mahan & Co. 118,000 loan. Don't fail me on deposits."

Appellant saw his agent Klein on Monday afternoon. On Tuesday morning, April 27, Glaeser, trust officer of a Chicago trust company acting as corporate agent of the hotel company, and Hershenson of Chicago, attorney for the hotel company, arrived in St. Louis with the express purpose of selling the hotel that day. They went direct from the train to the office of Klein, appellant's agent, where they conferred with appellant and Klein and were informed of the agreement existing between appellant and respondent. Later the same morning appellant, Klein, and the Chicago men went to the office of Lloyd, an officer of Lawyer's Title Company. There they were joined by Willson, the Chicago real estate agent who had procured the original purchase agreement for respondent. Appellant testified: "Well, arriving at the Title Company I prevailed on Mr. Glaeser and Mr. Hershenson who were there, they said to close the deal, to close Godwin's deal out and they had to catch an afternoon train back and they had to be in Chicago the next day. They couldn't see why they couldn't immediately close it. I said, 'With this instrument I must call Godwin and see if we can't, . . . there must be some misunderstanding here, and I think they can be ironed out. If you will just let me call him in Washington I think they will be straightened out.' Of course, the financing, I wanted to tell him we couldn't get the financing we said we could. So they finally agreed to let me call which I did. I did it on my own."

Then ensued two telephone talks with respondent in which each of the persons named above joined in from time to time over extensions of the telephone. One call lasted for sixty-four minutes. It is impossible to fully recount just what was said; the participants testified to conflicting versions. It seems that some of the Chicago men insisted that the Godwin deal could be closed only by the immediate payment of the entire purchase price. Respondent Godwin claimed that Glaeser had promised him a reasonable time to close the deal, if a deposit of $25,000.00 be made, and urged appellant to make the deposit of $30,000.00 called for by their agreement. Appellant refused to do that because, he says, he was uncertain that he could obtain sufficient financing to complete the deal. Hershenson testified that appellant had offered to deposit $30,000.00 [with some adjustments] that morning if they got more time; "or rather Graham would be willing to deposit, provided he made his arrangements with Godwin before he made that deposit. We told him as far as we were ▮▮▮▮ concerned, we were ready to go into the escrow and we had the documents and we weren't going to wait around another

sixty or ninety days, or any unusual or *unreasonable length of time; . . .*'' The hotel company representatives were somewhat fearful that, by forfeiting respondent's option, they would violate the provisions of the Soldiers and Sailors Relief Act. Respondent says that after much urging he agreed to accept a third deed of trust for $15,000.00 under certain conditions, and the next day executed and mailed two instruments, one to be used if appellant bought the property for himself and the other to be used if he bought it for himself and respondent.

After the telephone talks were completed, the hotel company representatives called a number of real estate dealers and induced them to make bids. Each of these bids, strange to say, seems to have been for the same amount, $155,000.00. While the bidding was going on, appellant remained in another room, but was kept informed by Willson, who had procured the original option for respondent. Willson's chief interest was to safeguard his claim for a commission, the amount of which claim was disputed by respondent. Willson seems to have had inside information as to the amount being bid for the property and told appellant he could buy it for $157,000.00. Willson, who was supposed to represent respondent, now turns up as an agent for appellant and he and Klein presented appellant's bid for $157,000.00 which was accepted. Appellant deposited $30,000.00, the same amount he had agreed upon with respondent, and was given about thirty days to close the deal. It was completed in that time, the conveyance being made to a straw party, one Helen Lott. She later conveyed to Isaac Graham and he to appellant. [Appellant eventually paid a commission of $5,400.00 to Willson. Klein sued appellant for a commission and the case was settled after the instant case was filed.] Appellant did not notify respondent that he had made the purchase. Respondent learned that fact some weeks later from an item in a newspaper and began at once to assert his claim to an interest in the property or in the profits from the sale.

It is impossible within reasonable space to review all the testimony and exhibits, but we believe we have stated enough to indicate the tenor of the whole.

The record furnishes abundant support for the finding of the chancellor that respondent was defrauded and that appellant participated in the fraud. The representatives of the hotel company were extremely desirous of foreclosing respondent's option. Why? They could then get more money for the property, and they did get $8,000.00 more. Appellant sat by and watched the manipulations which were intended to destroy respondent's option although he was duty bound and able to carry out the terms of the option. Why? He could then get the property for less, and he did get it for $19,750.00 less. True, there were other expenses besides the purchase price, and financing charges, but such expenses would have been

incurred if the purchase had been made under respondent's option. Appellant's explanations were so weak that his own counsel devote space in their brief to offer excuses for his testimony. At one place they say: "Hence his testimony is at times inconsistent and nearly always confused." Appellant says he was unwilling to make the deposit called for by his agreement for fear of being unable to finance the remainder of the purchase; yet within minutes after respondent's option was declared forfeited he deposited the same amount to purchase the property for himself. He admitted on the witness stand he had been investigating the matter for months before the purchase and knew about what financing he could get. His claim, that his agreement with respondent was rendered meaningless by some vague oral understanding, as well as his claim that the agreement was procured by misrepresentations are uncorroborated and incredible. Appellant claims that he signed the agreement on reliance of statements by respondent that certain financing could be had. The agreement does not so state. On the contrary it expressly states that appellant is to obtain the necessary financing in the event he should make the purchase. As previously stated, appellant then knew about what financing he could expect to get. Respondent's testimony that he had been promised a *reasonable* time to close, if a deposit of $25,000.00 be made, is at least indirectly corroborated by Hershenson's statement to appellant that an *unreasonable* time would not be granted. Respondent is also corroborated by the fact that appellant, by making a deposit of the same amount, was granted an extension of thirty days although the purchase price had been increased.

We think the following facts and reasonable inferences are established by the testimony. On his way from Washington to St. Louis appellant conceived a plan to get out from under his agreement with respondent. Accordingly, on Sunday, before he had talked with anyone about the deal, he wired respondent attempting to shift to respondent the burden of procuring a delay and the necessary financing, although appellant had assumed that burden and was reasonably sure he could perform it. On Tuesday occurred the meeting at the Lawyers Title Company. All the persons there realized that respondent's option was outstanding and a joint attack over the telephone was made to destroy it. Respondent agreed to, and the next day did, forward the two releases above mentioned. He must have done this for a consideration; he says he was to receive a third deed of trust. After the telephone talks, a so-called private auction was held and the sale was made to appellant. However, the deed was made to a straw party and respondent was never notified that appellant was the real purchaser.

We turn now to the legal points made by appellant in his brief.

■ *Point I.* States that it is the duty of this court to review the evidence on the merits; that fraud is never presumed; a petitioner must have clean hands; and, in construing a contract, we should consider the construction placed on it by the parties.

We agree to all that and, after complying with those requirements, find that fraud has been established by clear, cogent and convincing evidence.

■ *Point II.* States that respondent has an adequate remedy at law, and is not entitled to a partnership interest. (a) A petitioner in equity establishing an adequate remedy at law is not entitled to equitable relief. (b) The measure of damages for breach of an alternative contract, where no election has been made by the defaulting party having the power of election, is that alternative resulting in the lesser recovery. The alternative provision for purchase in the contract at bar is less than a one-half interest in the Park Manor.

We agree that the court erred in finding that respondent is entitled to a partnership interest. Under the agreement appellant had the choice of buying the property *from respondent*, or buying it in partnership *with respondent*. There is no evidence that appellant ever elected to go into partnership. The evidence is that he consistently refused that alternative. Nor did he buy *from* respondent. He bought the property in violation of his agreement and in fraud of respondent's rights under his option. The measure of damages is the profit that respondent would have made if appellant had not breached the agreement; that is, the sum of $19,750.00 being the difference between respondent's option price, $149,000.00, and the amount which appellant agreed to pay, $168,750.00. That is less than a one-half partnership interest and, as appellant did not elect either alternative under his agreement, is the measure of recovery. [Restatement of the Law, Contracts, Vol. I, p. 565, sec. 344.]

■ That does not mean that respondent could not sue on the equity side of the court because he had an adequate remedy at law by suit for damages. He is entitled to more than a money judgment; he is entitled to have his judgment decreed an equitable lien upon the property. Appellant is not in a position to assert that the suit is not properly in equity. The petition stated a cause of action in equity. Appellant filed an answer and cross-bill praying for affirmative equitable relief. [See 30 C. J. S., p. 794, sec. 382.] A ■ court of equity once acquiring jurisdiction will retain it until full justice has been done, [Phelps v. Scott, 325 Mo. 711, 30 S. W. (2d) 71, 71 A. L. R. 290] and may give damages in lieu of equitable relief. [Hadley Bros.-Uhl Co. v. Scott, (Mo. App.) 93 S. W. (2d) 276.]

428

■ *Point. III.* Appellant was not the fiduciary of respondent, neither his partner nor agent.

We have already held that appellant was not a partner and never disclosed an intention to become one. We do not concede that he was not the agent of respondent. He went to St. Louis under an agreement to close respondent's option and buy the property in accordance with it. For the purpose of closing the option he impliedly agreed to represent respondent. No express contract is necessary to create an agency; such may be implied. [2 C. J. S., p. 1045, sec. 23.]

In his reply brief appellant says: "Even if an agency were created, the usual rule that an agent cannot acquire an interest in the subject matter of the agency adverse to the interest of his principal would not be applicable. For here, under the Godwin-Graham contract, Graham had a right to elect to purchase the property entirely for his own benefit."

Appellant did have such right to purchase, but only in accordance with respondent's option; not in violation of his agreement to purchase from respondent. [2 C. J., p. 707, ¶ 363; Grumley v. Webb, 44 Mo. 444.]

■ *Point IV.* The purported agreement was contingent upon respondent having a valid option which he did not have.

We hold that respondent did have a valid option, and the interested persons so recognized by their frantic efforts to talk him out of it by the lengthly telephone conversations previously mentioned.

■ *Point V.* Appellant is not liable for Park Manor's refusal to honor the option.

We think the evidence shows that appellant fraudulently participated in such refusal.

■ *Point VI.* The order appointing a receiver was improvident, and he should be discharged at respondent's cost.

*Point VII.* The court erred in disallowing certain expenditures made by appellant.

We must sustain Point VI made by appellant except as to the taxing the costs of the receivership. A receiver was appointed on the theory that respondent is entitled to a partnership interest. We hold that he is entitled only to a money judgment secured by a lien on the property; and there was not sufficient grounds for the appointment of a receiver or for an accounting.

Point VII related to certain expenditures made by appellant in the operation of the hotel. Since we hold that respondent is not a partner and has no interest in the hotel, he is not concerned with such expenditures.

■ On this appeal we do not decide the question of how the cost of the receivership should be taxed. In equity cases, such as this,

the trial chancellor has considerable discretion to apportion costs. [Publicity Bldg. Realty Corp. v. Thomann, 353 Mo. 493, 183 S. W. (2d) 69.] This is particularly true where some issues are found for one party and some for the other. [Bruegge v. State Bank, (Mo.) 74 S. W. (2d) 835.] Although we here hold that no receiver should have been appointed, there may or may not be ground for apportioning that or other costs. The discretion is for the trial chancellor in the first instance, and not for an appellate court unless he abuses his discretion.

The judgment of the trial chancellor is reversed and the cause remanded with directions to discharge the receiver and to enter a judgment for $19,750.00 against appellant and Isaac Graham in favor of respondent, and to decree the same to be a lien upon the hotel property subject to valid encumbrances existing at the time of the trial. It is so ordered. All concur.