BAKER et al. v. SCHOFIELD.

(Circuit Court of Appeals, Ninth Circuit. February 15, 1915.)

No. 2438.

1. BANKS AND BANKING ⬥⟹261—NATIONAL BANKS—EFFECT OF ACTS ULTRA VIRES.

That a purchase of real estate by a national bank was in violation of the national banking law and ultra vires does not render the transaction void, but voidable only, and its validity cannot be questioned by private parties, but only by the United States.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 991–1000; Dec. Dig. ⬥⟹261.]

2. BANKS AND BANKING ⬥⟹287—RECEIVERS ON INSOLVENCY—SALE OF ASSETS—CONSTRUCTION OF ORDER.

An order of court authorizing the receiver of a national bank to sell at private sale all assets of the insolvent bank which were in his judgment bad and doubtful, "consisting of bills receivable, judgments, overdrafts, * * * and other personal and chattel property and evidences of indebtedness," did not confer on the receiver power to sell and assign a contract with the state for the purchase of tide lands, which as owner of the adjacent upland the bank had the preference right to purchase, and which contract conveyed to it an interest which under the state law was real estate.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ⬥⟹287.]

3. BANKS AND BANKING ⬥⟹287—RECEIVERS—FRAUDULENT SALE OF PROPERTY.

Evidence *held* to entitle the receiver of a national bank to recover tide lands, the contract for the purchase of which from the state had been sold and assigned by a former receiver, on the ground that such sale was fraudulent, as being subject to a secret trust in favor of the receiver; it appearing that the sum received was much less than the value of the property, that the nominal purchaser resold it two years later to the receiver for the same price, with interest, and that the receiver's ownership had been concealed, even up to the time of suit.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ⬥⟹287.]

4. BANKS AND BANKING ⬥⟹287—NATIONAL BANKS—RECEIVERS—SUIT TO RECOVER ASSETS.

A suit by the receiver of a national bank to recover real estate fraudulently transferred by a former receiver on a secret trust for himself *held* not barred by laches because of lapse of time, where the former receiver was still the owner of the property, and had been for 14 years, but it had never been in his name, and his connection with it had been carefully concealed.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 1089–1104, 1126, 1127; Dec. Dig. ⬥⟹287.]

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Jeremiah Neterer, Judge.

Suit in equity by John W. Schofield, as receiver of the Merchants' National Bank of Seattle, against Charles H. Baker, Algernon S. Norton, and the Seattle Water Front Realty Company. Decree for complainant, and defendants appeal. Affirmed.

For opinion below, see 212 Fed. 504.

⬥⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit in equity by John W. Schofield, as receiver of the Merchants' National Bank of Seattle, for the conveyance by the appellants (defendants in the court below) to him, as such receiver, of certain tide lands situated in the city of Seattle, Wash., alleged to be held in trust by the appellants for the use and benefit of the Merchants' National Bank of Seattle.

On June 19, 1895, the Merchants' National Bank of Seattle having become insolvent, the defendant, Charles H. Baker, was appointed receiver thereof by the Comptroller of the Currency of the United States, and immediately thereafter entered upon his duties as such receiver. Among the assets which came into Baker's hands as such receiver was a preference right to purchase from the state of Washington certain tide lands, containing approximately 12 acres, situated along the Seattle water front, in King county, Wash., and designated as block No. 430, Seattle tide lands. The preference right to purchase the tide lands existed in favor of the bank by virtue of the fact that it was the owner of the upland bordering thereon. On January 12, 1897, Baker, as receiver, entered into a contract with the state of Washington for the purchase of the tide lands; the state of Washington agreeing to sell the same to the Merchants' National Bank of Seattle in consideration of the sum of $1,488, the consideration to be paid by the bank in ten equal payments of $148.80, the first payment to be made at the time of the execution of the contract, one thereof on the 1st day of March, 1897, and one thereof on the 1st day of each and every March thereafter until the whole of the purchase price was paid. Upon payment of the full consideration for the tide lands, the bank, under the contract, became entitled to receive, and the state of Washington agreed to issue to it, a patent therefor. The execution of this contract between Baker, as receiver, and the state of Washington, had not been authorized by the Comptroller of the Currency; but on January 26, 1897, Baker requested that official, by letter, to ratify the contract, stating that the preference right of purchase was a valuable asset of the trust. On February 13, 1897, and in reply to Baker's letter, the Comptroller of the Currency authorized him to contract with the state of Washington for the purchase of the tide lands.

On October 6, 1897, Baker, as receiver, petitioned the Circuit Court of the United States for the District of Washington for an order authorizing and empowering him to compromise, compound, or sell at private sale all of the bad and doubtful assets of the Merchants' National Bank of Seattle then in his hands as receiver, for cost, or for such sums as in the judgment of the receiver was for the best interest of his trust and all persons concerned therein. Pursuant to such petition, and on the date of the filing thereof, the court entered an order authorizing and empowering Baker to sell at private sale all assets of the insolvent bank which were in his judgment bad and doubtful, consisting of bills receivable, judgments, overdrafts, stocks, bonds, warrants, securities, assessments upon the stockholders of said bank, and other personal and chattel property and evidences of indebtedness, for cash, for such sum or sums as to, as such receiver, might be able to obtain, and as should in his judgment be for the best interests of his trust. On November 26, 1897, Baker, as receiver, sold, assigned, and transferred all of the right, title, and interest of the Merchants' National Bank of Seattle in and to its contract with the state of Washington for the purchase of tide lands block No. 430 to one S. G. Simpson; the consideration being $198.80. The assignment authorized the state of Washington to receive from Simpson, or his assigns, the performance of all covenants and agreements specified in the contract to be performed by the bank, and upon such performance to execute to him a patent for such tide land. By virtue of the ownership by Simpson of the contract to purchase tide lands block No. 430, he became entitled, under the laws of the state of Washington, to the preference right to lease certain harbor area adjacent and appurtenant to tide lands block No. 430. Upon the purchase by Simpson of the contract to purchase the tide lands, there was issued to him by the state of Washington a certain lease, designated "Harbor Lease No. 181," covering the harbor area appurtenant to block No. 430.

In March, 1899, the contract between the Merchants' National Bank of Seattle and the state of Washington for the purchase of tide lands block No. 430, theretofore assigned to Simpson by Baker, as receiver, together with harbor

lease No. 181, covering the harbor area adjacent thereto, were purchased from Simpson by Baker in his individual capacity, and not as receiver. No formal assignment of the contract or of the lease was made, the record title continuing in the name of Simpson. In April, 1899, Baker resigned as receiver of the Merchants' National Bank of Seattle, and thereupon Judge A. W. Frater was appointed by the Comptroller of the Currency as receiver thereof. On August 11, 1905, S. G. Simpson, acting for and on behalf of Baker, assigned the contract for the purchase of tide lands block No. 430, together with the harbor lease No. 181, to one Algernon S. Norton. The consideration named in the assignment was $1. This assignment contained the same authorization respecting the patent to be issued by the state of Washington as that contained in the assignment to Simpson. On October 16, 1905, the state of Washington issued to Norton a patent covering all of block No. 430, with the exception of a strip of land 30 feet wide which had been granted as a right of way to the Seattle & San Francisco Railway & Navigation Company. In August, 1907, there was organized at Seattle, under the laws of the state of Washington, the Seattle Water Front Realty Company. Upon the incorporation of this company Norton conveyed to it tide lands block No. 430, theretofore conveyed to him by patent from the state of Washington, together with harbor lease No. 181, covering the harbor area adjacent and appurtenant thereto.

On February 12, 1913, Judge Frater resigned as receiver of the Merchants' National Bank of Seattle, and thereupon the plaintiff herein, John W. Schofield, was appointed receiver thereof by the Comptroller of the Currency. The present suit was instituted by Schofield immediately upon his appointment. It was alleged in the bill of complaint that the assignment of the contract between the bank and the state of Washington for the purchase of tide lands block No. 430 was made by Baker, as receiver, to Simpson, subject to a secret trust for the sole use and benefit of Baker, and for the purpose of defrauding the insolvent Merchants' National Bank of Seattle, and its creditors and stockholders; that Simpson took and held the contract for the purchase of the tide lands in trust for Baker and subject to his direction and control; that the assignment of the contract and harbor lease by Simpson to Norton was made for the sole use and benefit of Baker; that Norton held the contract and the harbor lease, and, after issuance to him of the patent from the state of Washington, held the legal title to the tide lands for the sole and exclusive use of Baker; that the Seattle Water Front Realty Company was incorporated, and the legal title to the tide lands, together with the harbor lease, was conveyed to it by Norton, in furtherance of the fraudulent plan of Baker to appropriate to himself and conceal and convert the assets of the Merchants' National Bank of Seattle, and to defeat the rights of its creditors and stockholders; and that the legal title to the tide lands is now held by the Seattle Water Front Realty Company as trustee for the plaintiff herein, as receiver of the Merchants' National Bank of Seattle. It was further alleged in the bill that the facts therein set forth were concealed by the defendants, and were wholly unknown to any of the creditors or stockholders of the bank, or to the plaintiff herein, or to the Comptroller of the Currency of the United States, until the 1st day of February, 1913, and that the plaintiff, as such receiver, had been directed by the Comptroller of the Currency to commence and prosecute this suit.

Answers were filed by the defendants, denying the material allegations of the bill, and after the taking of testimony before the court a decree was entered adjudging that tide lands block No. 430 was an asset of the Merchants' National Bank of Seattle; that the assignment by Baker, as receiver, to Simpson, of the contract for the purchase of the tide lands, was fraudulent, and was made for the secret use and benefit of Baker; that the repurchase of the contract by Baker was void as against the bank; that the assignment of the contract to the defendant Norton by Simpson, and the conveyance from Norton to the Seattle Water Front Realty Company, were also null and void. It was decreed that the Water Front Realty Company execute and deliver to the clerk of the court below, for the plaintiff, as receiver, its deed covering all of its right, title, and interest in and to block No. 430, Seattle tide lands, and also an assignment of the harbor lease No. 181, appurtenant to the tide lands. It

was further decreed that the plaintiff, as receiver, pay to the clerk of the court below, for the Seattle Water Front Realty Company, the sum of $10,-977.13, being the amount of the payments, with interest, made by the defendants to the state of Washington under the contract for the purchase of block No. 430, upon the harbor lease No. 181, and for taxes.

B. S. Grosscup and W. C. Morrow, both of Tacoma, Wash., and Corwin S. Shank and Horatio C. Belt, both of Seattle, Wash., for appellants.

Frederick Bausman, Daniel Kelleher, R. P. Oldham, and R. C. Goodale, all of Seattle, Wash., for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). [1] 1. The validity of the contract of January 12, 1897, between Baker, as receiver of the bank, and the state of Washington, for the purchase of the tide lands, is attacked by the defendants on the ground that the contract was ultra vires; its execution being an exercise of power not conferred upon national banks, or receivers thereof, by the statutes of the United States. Section 5137 of the Revised Statutes of the United States (Comp. St. 1913, § 9674) provides as follows:

"A national banking association may purchase, hold, and convey real estate for the following purposes, and for no others:

"First. Such as shall be necessary for its immediate accommodation in the transaction of its business.

"Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

"Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

"Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by the association, or shall purchase to secure debts due to it.

"But no such association shall hold the possession of any real estate under mortgage, or the title and possession of any real estate purchased to secure any debts due to it, for a longer period than five years."

Chapter 28 of the Act of March 29, 1886 (24 Stat. 8 [Comp. St. 1913, §§ 9828–9830]), provides as follows:

"Whenever the receiver of any national bank duly appointed by the Comptroller of the Currency, and who shall have duly qualified and entered upon the discharge of his trust, shall find it in his opinion necessary, in order to fully protect and benefit his said trust, to the extent of any and all equities that such trust may have in any property, real or personal, by reason of any bond, mortgage, assignment, or other proper legal claim attaching thereto, and which said property is to be sold under any execution, decree of foreclosure or proper order of any court of jurisdiction, he may certify the facts in the case, together with his opinion as to the value of the property to be sold, and the value of the equity his said trust may have in the same, to the Comptroller of the Currency, together with a request for the right and authority to use and employ so much of the money of said trust as may be necessary to purchase such property at such sale."

It is obvious that the contract for the purchase of the tide lands could not have been executed under section 5137 of the Revised Statutes. It does not fall within any of the purposes enumerated in that section for which national banks may purchase, hold, and convey real estate. Nor can the provisions of the act of March 29, 1886, be

construed to give validity to the contract. The bank had no equity in the property "by reason of any bond, mortgage, assignment or other proper legal claim attaching thereto," nor was the property "to be held under any execution, decree of foreclosure or other proper order of any court."

The contract for the purchase of the tide lands grew out of the preference right to purchase, under the laws of the state of Washington, which existed in favor of the bank by virtue of the fact that it was the owner of the upland bordering thereon. The record does not disclose the manner in which the bank became the owner of the upland. It must be assumed, however, that the acquisition of the upland by the bank was in all respects legal. In the light of the fact, well known in the field of commerce, that the value of property adjacent to harbor sites may be increased to a material extent by reason of a preference right to purchase tide lands adjacent thereto, we think that the contract between the bank and the state for the purchase of the tide lands might well be viewed as a part of the transaction by which the bank acquired the upland, and as much a part of the valuable assets of the bank as would have been the original littoral or riparian right attached to the upland.

But, in the view which we take of this case, the question of the right of the receiver to execute the contract on behalf of the bank for the purchase of the tide lands becomes immaterial. It may be conceded that the contract was ultra vires. But its invalidity by reason of the fact that it was ultra vires cannot be interposed by the defendants as a defense to a suit of this character. In the case of National Bank v. Matthews, 98 U. S. 621, 25 L. Ed. 188, it appeared that Matthews and another person had given their joint note to a mercantile company for $15,000, secured by a deed of trust on certain real property in Missouri, executed by Matthews alone. Soon afterwards the company assigned the note and deed of trust to the Union National Bank of St. Louis, to secure a loan made to it at the time. The loan was not paid at maturity, and the bank directed the trustee to sell the premises. Matthews thereupon filed a bill to enjoin the sale, upon the ground that the loan was made upon real security in violation of section 5136 of the Revised Statutes restricting loans by national banks to personal security. Mr. Justice Swayne, delivering the opinion of the Supreme Court of the United States, said:

"The object of the restrictions was obviously threefold. It was to keep the capital of the banks flowing in the daily channels of commerce; to deter them from embarking in hazardous real estate speculations; and to prevent the accumulation of large masses of such property in their hands, to be held, as it were, in mortmain. The intent, not the letter, of the statute constitutes the law. A court of equity is always reluctant in the last degree to make a decree which will effect a forfeiture. The bank parted with its money in good faith. Its garments are unspotted. Under these circumstances, the defense of ultra vires, if it can be made, does not address itself favorably to the mind of the chancellor. We find nothing in the record touching the deed of trust which, in our judgment, brings it within the letter or the meaning of the prohibitions relied upon by the counsel for the defendant in error. * * * Sedgwick (Stat. and Const. Constr. 73) says: 'Where it is a simple question of authority to contract, arising either on a question of regularity of organization or of power conferred by the charter, a party who has had the benefit of the

agreement cannot be permitted in an action founded upon it to question its validity. It would be in the highest degree inequitable and unjust to permit a defendant to repudiate a contract, the benefit of which he retains.' * * * We cannot believe it was meant that stockholders, and perhaps depositors and other creditors, should be punished, and the borrower rewarded, by giving success to this defense whenever the offensive fact shall occur. The impending danger of a judgment of ouster and dissolution was, we think, the check, and none other, contemplated by Congress. That has always been the punishment prescribed for the wanton violation of a charter, and it may be made to follow whenever the proper public authority shall see fit to invoke its application. A private person cannot, directly or indirectly, usurp this function of the government."

In National Bank v. Whitney, 103 U. S. 99, 26 L. Ed. 443, the facts were as follows: Whitney had executed a mortgage upon certain premises to the National Bank of Genesee, N. Y., providing in terms for the payment of $5,000 one year from its date, with interest, but declaring that it was made as collateral security for the payment of all notes which the bank held at the time against him, and for his other indebtedness then due or thereafter to become due. The principal question for determination related to the validity of the mortgage of Whitney to the national bank, so far as it applied to future advances to him. It was contended by Whitney that the mortgage to the bank, so far as it applied to future advances, was invalid, because a mortgage of that character was prohibited by section 5137 of the Revised Statutes. The Supreme Court of the United States, in overruling this contention and referring to the construction of that act given in National Bank v. Matthews, supra, said:

"The construction of the act of Congress thus given has been acted upon by the national banks throughout the country ever since it was published. It is not unreasonable to suppose that they have conducted their business and made loans to a large amount in reliance upon it, and that in many cases great injury would follow a departure from it. Judicial decisions affecting the business interests of the country should not be disturbed, except for the most cogent reasons; certainly not because of subsequent doubts as to their soundness. The prosperity of a commercial country depends, in a great degree, upon the stability of the rules by which its transactions are governed. If there should be a change, the Legislature can make it with infinitely less derangement of those interests than would follow a new ruling of the court, for statutory regulations would operate only in future. The decision in the case cited controls the present case, and in conformity with it we must hold that the mortgage to the bank, so far as the subsequent incumbrances are concerned, is to be regarded as a valid security for the future advances to the mortgagor. Whatever objection there may be to it as security for such advances from the prohibitory provisions of the statute, the objection can only be urged by the government."

In Reynolds v. Crawfordsville Bank, 112 U. S. 405, 5 Sup. Ct. 213, 28 L. Ed. 733, the Supreme Court, again construing section 5137 of the Revised Statutes, said:

"The National Banking Law (Revise Statutes, § 5137) provides that a national banking association may purchase such real estate as shall be mortgaged to it in good faith by way of security for debts previously contracted. The power to purchase the real estate in dispute was therefore clearly conferred by the statute. The fact that, in order to secure the same debt, it purchased other real estate not mortgaged to it, cannot affect the title to the land which it was authorized to purchase. But if there was any force in this objection to the title, it could not be raised by the debtor, for where a corpora-

tion is incompetent by its charter to take a title to real estate, a conveyance to it is not void, but only voidable. The sovereign alone can object. It is valid until assailed in a direct proceeding instituted for that purpose"—citing National Bank v. Matthews, supra, National Bank v. Whitney, supra, and Swope v. Leffingwell, 105 U. S. 3, 26 L. Ed. 939.

In Thompson v. St. Nicholas National Bank, 146 U. S. 240, 13 Sup. Ct. 66, 36 L. Ed. 956, the Supreme Court said:

"It has been held repeatedly by this court that where the provisions of the National Banking Act prohibit certain acts by banks or their officers, without imposing any penalty or forfeiture applicable to particular transactions which have been executed, their validity can be questioned only by the United States, and not by private parties."

In Schuyler National Bank v. Gadsden, 191 U. S. 451, 24 Sup. Ct. 129, 48 L. Ed. 258, the doctrine was again reiterated by the Supreme Court in the following language:

"It is no longer open to controversy that the provisions of the statutes of the United States forbidding the taking of real estate security by a national bank for a debt coincidently contracted do not operate to make the security void, and thus enable the individual who has contracted with the bank to defeat recovery, but simply subject the bank to be called to account by the government for exceeding its powers."

[2] 2. The next question in the case relates to the validity of the assignment of the contract for the purchase of the tide lands made by Baker, as receiver, to Simpson. The validity of that assignment is attacked by the plaintiff on two grounds: First. The assignment was void in law, it not being authorized by order of court, as provided by the statute. Second. The assignment, even if good in law, was made by Baker to Simpson subject to a secret trust, for the sole use and benefit of Baker, and for the purpose of defrauding the Merchants' National Bank of Seattle and its creditors and stockholders. The objections will be considered in the order given.

Section 5234 of the Revised Statutes of the United States (Comp. St. 1913, § 9821), after providing for the appointment of receivers for defaulting national banks, provides as follows:

"Such receiver, under the direction of the Comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon the order of a court of record of competent jurisdiction, may sell or compound all bad or doubtful debts, and, on a like order, may sell all the real and personal property of such association, on such terms as the court shall direct; and may, if necessary to pay the debts of such association, enforce the individual liability of the stockholders. * * *"

On October 6, 1897, pursuant to a petition filed by Baker as receiver of the bank, the Circuit Court of the United States for the District of Washington entered an order authorizing and empowering Baker to sell at private sale "all assets of the insolvent bank which were in his judgment bad and doubtful, consisting of bills receivable, judgments, overdrafts, stocks, bonds, warrants, securities, assessments upon the stockholders of said bank, and other personal and chattel property and evidences of indebtedness." This was the only order for the sale of assets of the bank made by the court. The authorization therein given was clearly insufficient to warrant the assignment of the

contract for the purchase of the tide lands. The order of the court applied to assets of the bank which were in the judgment of the receiver bad or doubtful. It appeared from Baker's letter of January 26, 1897, to the Comptroller of the Currency, that the right of purchase of the tide lands was at that time, in his judgment, a valuable asset of the estate. There is nothing in the record tending to show that the value of the right had depreciated between the date of Baker's letter on January 26, 1897, and November 26, 1897, the date of the assignment of the contract to Simpson.

But there is a stronger reason why the order of the court was insufficient to confer upon the receiver authority for the assignment to Simpson. The assets to be sold were stated to consist of "bills receivable, judgments, overdrafts, stocks, bonds, warrants, securities, assessments upon the stockholders of said bank, and other personal and chattel property and evidences of indebtedness." The order of the court in terms applied only to personal property. Under the decisions of the Supreme Court of the state of Washington, the interest of the bank in the tide lands under the agreement to purchase was real estate. Washington Iron Works Co. v. King County, 20 Wash. 150, 54 Pac. 1004; Trimble v. Superior Court, 31 Wash. 445, 72 Pac. 89, 66 L. R. A. 897; State ex rel. Wilson v. Grays Harbor & Puget Sound Ry. Co., 60 Wash. 32, 110 Pac. 676.

The order of the court of October 6, 1897, did not authorize the receiver to sell real estate, and no order was ever entered or made by the court authorizing such sale. But whether the sale and assignment of the contract by Baker, as receiver, to Simpson, without an order of the court, could alone be made a sufficient basis for a decree in favor of the plaintiff in this suit, is a question we do not decide. The fact that there was no order made for the sale of the contract, and it was therefore made and assigned without legal authority, is in and of itself evidence tending to show the concealment and fraudulent character of the transaction.

[3] We pass, therefore, to the second objection urged by the plaintiff to the assignment by Baker to Simpson, viz., that it was made subject to a secret trust for the sole use and benefit of Baker and for the purpose of defrauding the Merchants' National Bank of Seattle and its creditors and stockholders.

3. The contract for the purchase of the tide lands was assigned by Baker, as receiver of the bank, to Simpson, on the 26th day of November, 1897. The consideration named therein was $198.80. The real consideration, according to the testimony of Baker, was $50; the balance of the consideration named in the assignment, to wit, $148.80, representing the first payment on the contract which had been made by the bank to the state of Washington at the time of the execution thereof. Baker further testified that the contract covering block 430 was resold by Simpson to him, at his request, in March, 1899, for between $300 and $400, which represented the purchase price paid by Simpson, $198.80, plus the payment of March, 1898, to the state of Washington, $148.80, together with interest. No written assignment of the contract, or other document evidencing the transfer, was ever

executed; Baker testifying that he told Simpson he would like to have him carry the title for him, for the reason that there were at that time several judgments outstanding against him. During all these transactions Baker continued as receiver of the Merchants' National Bank of Seattle. He resigned as such receiver in April, 1899.

The title to the contract remained in Simpson from the date of its assignment to him by Baker, as receiver, until August, 1905. At about this time, according to the testimony of Baker, he took up with Simpson the matter of acquiring the legal title to the contract. Simpson had made all of the annual payments to the state of Washington pursuant to the terms of the contract. Baker testified that he gave to Simpson his note for the amount of these various payments, and at his (Baker's) request the title to the contract was placed in the name of Algernon S. Norton, Baker's New York attorney. The record shows that the assignment from Simpson to Norton was executed on August 11, 1905. Thenceforth the contract of purchase, and (after the issuance of the patent by the state of Washington to Norton on October 16, 1905) the legal title to the tide lands, remained in Norton until the organization of the Seattle Water Front Realty Company in August, 1907. The property was then transferred by Norton to the Realty Company, at the request of Baker, in payment of the complete issue of its capital stock of $250,000. About 95 per cent. of the stock was issued to Baker, or to others in trust for him, and he is at the present time the owner of all of the stock of the Realty Company, with the exception of a few shares held by his friends for voting purposes. Despite Baker's ownership of practically all of the stock of the Realty Company, neither at the time of the organization of that company nor at any time since its organization has he held office in the company in any capacity.

Baker testified that at the time of the assignment of the contract by himself, as receiver of the bank, to Simpson, he reserved no interest, present or expectant, therein, nor did he at that time have any expectation of ever acquiring any interest in the contract. But we are of opinion that the testimony of the other witnesses in the case, viewed in the light of all of the circumstances surrounding the transfer of the contract to Simpson, as well as the transactions relating to the subsequent transfers of the contract, contradicts Baker's testimony, and conclusively establishes the fact that the assignment of the contract for the purchase of the tide lands by Baker, as receiver of the bank, to Simpson, was made with a secret understanding between Simpson and Baker that the contract should be held in trust by Simpson for the use and benefit of Baker.

It appears from the record that the Klondike gold discovery in Alaska occurred in July, 1897. There is abundant testimony tending to show that real estate generally in Seattle, and the tide lands particularly, were greatly increased in value by reason thereof, and that the fair market value of block 430 of the Seattle tide lands in November, 1897, was $5,000. The contract for the purchase of this block was conveyed by Baker, as receiver, to Simpson, for $198.80. The testimony further tended to show, and the court below found, that the market value of block 430 in March, 1899, was from $5,000 to $15,000. Baker

repurchased the contract from Simpson for from $300 to $400. In the same month (March, 1899) certain portions of tide lands block No. 431, adjoining block 430, were sold by Baker, as receiver of the bank, to one William Pigott, for $1,700. It appears from the testimony that the lands sold to Pigott were in litigation, and were of less value than any portion of block 430. Had the assignment of the contract for the purchase of the tide lands from Baker, as receiver, to Simpson, been a bona fide transaction, vesting in Simpson the absolute right of disposition thereof, it is absolutely inconceivable that Simpson would have reconveyed the contract to Baker for $300 or $400, which represented no profit to Simpson, but solely the amount of money which he had expended, with interest, and at a time when adjoining property of less value was selling for $1,700.

Francis Rotch, a witness for the plaintiff, testified that he had been bookkeeper and private secretary to Simpson from 1898 to the time of Simpson's death in 1906. He testified to a conversation with Simpson in 1900 respecting an interest payment which had become due on block 430. Upon asking Simpson if he should pay it, Simpson replied:

"Yes, pay it; but that belongs to Charlie Baker."

The witness testified that he paid the interest and charged it against Baker in his books. This witness testified to a further conversation with Simpson about 1902. It seemed that Simpson had been selling a lot of his holdings for the purpose of securing cash. In response to a question of the witness as to whether he could dispose of block 430, Simpson replied:

"No; Mr. Baker put that in my hands, and I have held it in trust for him right along. We can't dispose of that."

Lester Turner, a witness for the plaintiff, testified to a conversation with Simpson respecting tide lands, in the year 1898 or 1899, as follows:

"He told me that a portion of these lands belonged to Charlie Baker; that he was carrying the title for him, to accommodate him."

Turner testified to a second conversation with Simpson, a year or two later, as follows:

"I asked him how he came to hold the title to that property that belonged to Baker. 'Well,' he said, 'Baker didn't want it known that he had taken the property while he was receiver of the bank and it might not bear investigation,' and he was carrying it for him for that reason."

Mark E. Reed was a son-in-law of Simpson, and had charge of the properties of Simpson under a general power of attorney. Reed testified to a conversation between himself and Simpson with respect to the tide lands, in 1904, as follows:

"He said: 'Now, these West Seattle tide lands belong to Charlie Baker. When you are reimbursed for the amount we paid on it, you transfer it.'"

Baker testified that Simpson had made the payments to the state of Washington called for by the contract of purchase, subsequent to its assignment to him, and prior to the repurchase by Baker in March, 1899. But there was introduced in evidence the following letter, writ-

teй by Baker to Reed on May 9, 1904, during the pendency of the negotiations for the transfer from Simpson to Baker, or to Norton, of the legal title to the contract (the italics are ours):

"I had a talk with Mr. Simpson in S. F. about the tide lands which he holds in trust for me. I asked him if he would take my note in settlement of the advances he has made, together with the interest accrued thereon. *The first two or three payments I made myself.* Mr. Simpson's books, however, will show the status of the account. There is one more payment due next March to complete the contract with the state. Mr. S. stated that you held his general power of attorney and would assign the certificate back to me or my order. I wish you would compile a statement of the account I owe to Mr. Simpson, and send same, together with note for the account, due one year after date, which plan Mr. S. consented to and will doubtless advise you to that effect. I may be away several months, and I may have occasion to use the item, or to dispose of it, and so I think it had better be put in the shape indicated. My address will be as below. I believe there is an item to my credit also of a certain sum for right of way across the tract sold to the N. P."

We agree with the court below that:

"There was a condition of mind between Baker and Simpson, express or otherwise, which was that Baker should have block 430. When the relation of the parties, the value of the land, and all of the circumstances as disclosed by the evidence, are analyzed and applied, together with the suppression of the ownership of defendant Baker, the conclusion is inevitable."

The rule is laid down by the text-writers, and adhered to in many authoritative decisions, that if an agent or trustee, in the sale of property of his principal, purchases it himself, or any interest therein, either directly or through the instrumentality of a third person, without the knowledge or consent of the principal, the sale is voidable, and may be set aside at the option of the principal. Mechem on Agency, §§ 455, 461; Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076; Gardner v. Ogden, 22 N. Y. 327, 78 Am. Dec. 192; Grumley v. Webb, 44 Mo. 444, 100 Am. Dec. 304; Mills v. Goodsell, 5 Conn. 475, 13 Am. Dec. 90; Bain v. Brown, 56 N. Y. 288.

The rule is one calculated to promote fair dealing between an agent or trustee and his principal. It is but one of the many safeguards which the law has thrown around those occupying positions of trust and confidence. It prohibits an agent or trustee from becoming a party to a transaction in which he may be in a position to injure his principal. As stated by Judge Manning in People v. Township Board of Overyssel, 11 Mich. 222, 225:

"So careful is the law in guarding against the abuse of fiduciary relations that it will not permit an agent to act for himself and his principal in the same transaction, as to buy of himself, as agent, the property of his principal, or the like. All such transactions are void, as it respects his principal, unless ratified by him with a full knowledge of all the circumstances."

The leading case in the United States upon this subject is Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076. In that case a piece of property had been sold at a fair price at a legally conducted judicial sale. The purchasers within a short time reconveyed it to the executors individually. It was decided that the purchasers at the sale were purely nominal. The Supreme Court said:

"The morality and policy of the law, as it is administered in courts of equity, induce us to add that these purchases were fraudulent and void, and may be

declared to be so, without further inquiry, upon the ground that they were made by the intervention of persons who were nominal buyers of the property for the purpose of conveying it to the executors. Such a transaction carries fraud upon the face of it. * * * The rule of equity in every jurisdiction with which we are acquainted is that a purchase by a trustee or agent of the particular property of which he has the sale, or in which he represents another, whether he has an interest in it or not—per inter positam personam—carries fraud on the face of it."

In Boynton v. Brastow, 53 Me. 362, real estate had been sold by executors and subsequently purchased by one of them at the price for which it had been sold. The court said:

"It is enough, however, for us to know that the property was redeeded to one of the trustees for the same consideration for which it was sold, before his duties as trustee were ended. Equity will not permit a trustee thus to deal with a trust property, except for the benefit of the cestui que trust. Sound policy requires all the skill and efforts of a trustee to be used for the benefit of the cestui que trust, and to secure this end, his private interest must not be allowed to come in conflict with his duty. If a trustee should be allowed to sell the trust's estate, and then immediately buy it back for his own benefit, his private interest would be in direct conflict with his duty. To enable him to buy cheap, he must sell cheap. Instead of making known its good qualities, and its real value, and the true state of the title, he would be influenced to disparage the estate, by concealing, as far as he could, everything which would enhance its value, and to avoid clearing up any clouds that might hang over the title."

In Robertson v. Chapman, 152 U. S. 673, 14 Sup. Ct. 741, 38 L. Ed. 592, the facts were as follows: One Polk had been appointed as agent of the plaintiff, Robertson, for the purpose of selling certain real property to M. O'Donohoe. O'Donohoe was unable to complete the payments under his contract of purchase, and before the deed was delivered to O'Donohoe, and while the same was in the hands of Polk, the agent, to be delivered upon payment of the balance of the purchase price of the land, Polk took over the O'Donohoe contract and completed title in himself. Robertson subsequently brought suit against Polk and his partner, Chapman, to set aside the transaction, on the theory that Polk could not properly have taken title to the property. Mr. Justice Harlan, delivering the opinion of the Supreme Court of the United States, said:

"If an agent to sell effects a sale to himself, under the cover of the name of another person, he becomes, in respect to the property, a trustee for the principal, and at the election of the latter, seasonably made, will be compelled to surrender it, or, if he has disposed of it to a bona fide purchaser, to account, not only for its real value, but for any profit realized by him on such resale."

The court found that Polk had not been guilty of dereliction of duty; that while there was some evidence tending to show that he desired, from the outset, to acquire an interest in the property, it did not appear that he intended to practice any deception upon the plaintiff. The court also found that Polk had not intended to conceal the fact of his purchase of the property. It accordingly was held that the rule quoted was not applicable to the facts of that case. The court said:

"A real bona fide sale of the property, through the agency of Polk, and upon the terms prescribed by the plaintiff, and which sale was substantially completed between vendor and vendee, intervened between Polk's acceptance of

the position of agent and his purchase of the property from the plaintiff's vendee. Upon this ground, the decree below can be sustained, without impairing, in any degree, the rule that an agent will not be permitted to become the purchaser, without the knowledge or consent of his principal, of property committed to him for sale."

The defendants earnestly contend that the facts of the present case bring it within the rule laid down in Robertson v. Chapman. It is obvious that that rule is inapplicable here. Baker's deceit, as we have seen, is well established. Furthermore, no real bona fide sale of the contract for the purchase of the tide lands had intervened between Baker's appointment as receiver of the bank, and his purchase of the contract.

[4] 4. In answer to the contention of the defendants that the present suit is barred by laches, little need be said. We have searched the record in vain for testimony, even of the slightest, tending in the remotest degree to show either actual knowledge, or any channel leading to knowledge, on the part of the plaintiff, or his predecessors in office, or the Comptroller of the Currency of the United States, respecting the purchase by Baker of the contract covering the tide lands during the term of his receivership. During Baker's 14 years' ownership of this property, never once has it appeared in his name. Although Baker himself testified that, when he negotiated with Simpson for the transfer of the legal title to the contract of purchase, to himself, all outstanding claims against him had been satisfied and he was practically out of debt, nevertheless the title to the contract was placed in the name of Norton, his New York attorney, where it remained until the organization of the Seattle Water Front Realty Company. Although the owner of practically all of the stock of that company from the date of its organization down to the present time, Baker has never appeared in any of its activities as an officer thereof, or in any other capacity. Every avenue by which the transactions affecting the transfer of real property generally become known in the business world has been guardedly closed; every act tending to show the relationship of Baker to the tide lands has been zealously guarded.

"In general, length of time is no bar to a trust clearly established to have once existed; and where fraud is imputed and proved, length of time ought not to exclude relief. Prevost v. Gratz, 6 Wheat. 481 [5 L. Ed. 311]. Generally speaking, when a party has been guilty of such laches in prosecuting his equitable title as would bar him if his title were solely at law, he will be barred in equity, from a wise consideration of the paramount importance of quieting men's titles, and upon the principle that 'expedit reipublicæ ut sit finis litium'; although the statutes of limitation do not apply to any equitable demand, courts of equity adopt them, or at least generally take the same limitations for their guide, in cases analogous to those in which the statutes apply at law. 10 Ves. 467; 1 Cox, Ch. 149. Still, within what time a constructive trust will be barred must depend upon the circumstances of the case. Boone v. Chiles, 10 Pet. 177, 9 L. Ed. 388. There is no rule in equity which excludes the consideration of circumstances, and, in a case of actual fraud, we believe no case can be found in the books in which a court of equity has refused to give relief within the lifetime of either of the parties upon whom the fraud is proved, or within 30 years after it has been discovered or becomes known to the party whose rights are affected by it." Michaud v. Girod, 4 How. 502, 560, 11 L. Ed. 1076.

5. The court below decreed that the plaintiff, as receiver, pay to the clerk of the court, for the Seattle Water Front Realty Company, the sum of $10,977.13, being the amount of the payments, with interest, made by the defendants to the state of Washington under the contract for the purchase of the tide lands, upon the harbor lease, and for taxes. The defendants assert that they should not be compelled to reconvey the tide lands to the plaintiff, as receiver, for the reason that the testimony in the case shows that the receiver has no funds in his hands, and that there are no assets of the bank except the claim asserted in this suit. But such defense is not available to the defendants on this appeal. This court will presume that the money will be paid into the court below for the defendants, as directed by the decree, and that a reconveyance of the tide lands will not be demanded until such sum has been paid into the court below.

The decree of the court below is affirmed.