J. ARTHUR ANDERSON et al., Appellants, v. CLARENCE D. JOHNSON, JOHN C. ROBERTS, SAMUEL T. G. SMITH, EDWARD A. FAUST, HARRY M. PFLAGER, FRANCIS E. NULSEN, HERBERT L. PARKER, JAMES C. JONES, ALBERT B. LAMBERT, J. BOYLE PRICE and GLEN ECHO COUNTRY CLUB.

Division Two, March 4, 1919.

1. **SALE OF REAL ESTATE: Purchase by Committee of Club: Trustees.** Where the stockholders of a country club, heavily in debt and whose property was encumbered by a past-due mortgage, were clearly informed, by resolutions which they themselves had adopted and by notices put up at conspicuous places on the grounds and published in newspapers, that the property would be sold at a receivership public sale to the highest bidder for cash, in accordance with plans worked out by a committee appointed by them for the purpose and submitted to them for approval and approved by them almost unanimously, and that after the sale the members of the club "would cease to have any rights in the property," it will not be held that a purchase by the five members of the committee and four other members of the club was a purchase by trustees for the club and its members.

2. ———: ———: ———: **Fiduciary Relation.** Where factionalism among members of a club induced stockholders to vote for a sale of its property and a dissolution of the club, and a committee was appointed to reorganize a new club if a majority of the members would unite in organizing it, and the committee invited all old members to indicate their willingness to unite in a new club, and much less than a majority did so, and nothing was concealed and the members were not misled, there was no such fiduciary relation as made the members of the committee trustees for the members of the club at their purchase of the property with their own money at the receivership sale.

Appeal from St. Louis Circuit Court.—*Hon. John W. McElhinney*, Judge.

AFFIRMED.

*Manton Davis* and *Frank H. Sullivan* for appellants.

(1)   The defendants occupied a fiduciary relation toward Glen Echo Country Club and its members, such as to inhibit them from purchasing the club's property for their own benefit. Dent v. Bennett, 4 Mylne & Cr. 277; Buffelow v. Buffelow, 2 Dev. & Bat. Eq. 250. These cases are quoted with approval in Cadwallader v. West, 48 Mo. 496, and in Ryan v. Ryan, 174 Mo. 286. See also Sims v. Sims, 101 Mo. App. 418; Tate v. Williamson, L. R. 2 Chy. App. 60; 2 Pomeroy's Equity Jurisprudence (3 Ed.), sec. 956, and footnote; Billage v. Southee, 9 Hare, 540; Connecticut Co. v. Smith, 117 Mo. 295; Bingham v. Sheldon, 101 N. Y. App. Div. 52; Rea v. Copelin, 47 Mo. 83; Grumley v. Webb, 44 Mo. 444; Trice v. Comstock, 121 Fed. 620; Frolich v. Seacord, 180 Ill. 85; Fort v. First Baptist Church, 55 S. W. (Tex. Civ. App.) 408.   (2)   A third person who knowingly participates with a trustee in his breach of trust is accountable even as the trustee.   Trice v. Comstock, 121 Fed. 620; McKinley v. Williams, 74 Fed. 92; Schofield v. Baker, 212 Fed. 507; Hay v. Long, 139 Pac. (Wash.) 761; Reeves v. Calloway, 78 S. E. (Ga.) 720; Zinc Co. v. Harwood, 103 N. E. (Mass.) 1039; Robins v. Ruttar, 24 Ill. 432; Amery v. Parrott, 107 Mass. 100; Peabody v. Flint, 6 Allen (Mass.) 55. (3)   Actual fraud, while amply shown, is entirely unnecessary.   Thornton v. Irwin, 43 Mo. 163; Cummings v. Parker, 250 Mo. 437.

*W. Christy Bryan* and *A. E. L. Gardner* for respondents.

(1)   The defendants were not trustees nor did they occupy any fiduciary relation to plaintiffs; therefore they had a right to do as they did. Chapin v. Cherry, 243 Mo. 375; Ferguson v. Robinson, 258 Mo. 113; Stevens v. Haynes, 220 Mo. 199. (2) If defendants ever were trustees or occupied any fiduciary relation to plaintiffs, defendants fully discharged their duty and obligation when they made their report dated March 31, 1915, and voted the proxies they had received in favor of the

dissolution, as they were instructed to do. (3) Defendants had a right to protect their own interests in the property. Even a trustee (and we deny defendants were such) may, where he has an interest to protect, buy in the trust property, the *cestui que trust* having refused to contribute to discharge the mortgage. Hardwicke v. Wurmser, 180 S. W. 455; Fisk v. Sarber, 6 Wis. 18. (4) There was no express trust. If there were it must have been "manifested and proved by some writing." R. S. 1909, sec. 2868; Hillman v. Allen, 145 Mo. 638; Price v. King, 112 Mo. 419; In re Estate of Soulard, 141 Mo. 642; Heil v. Heil, 184 Mo. 665; Ewing v. Parrish, 148 Mo. App. 492; Mugan v. Wheeler, 241 Mo. 376; Ferguson v. Robinson, 258 Mo. 113; Miazza v. Yerger, 53 Miss. 135. (5) Nor is there any resulting trust. That kind of a trust arises where one person furnishes the money for the purchase of property and the title to it is taken in the name of another. Here no money was furnished by plaintiffs or any one else but defendants. (6) The fact that an express trust is not in writing will not give rise to a resulting trust, and the court will not declare a resulting trust where there is an express trust alleged, though the same cannot be proved. Green v. Cates, 73 Mo. 115. "If there is an express trust, there can be no resulting trust." Hillman v. Allen, 145 Mo. 638. (7) No constructive trust. (a) "These trusts do not rest in contract, but in fraud." Ferguson v. Robinson, 258 Mo. 113. (b) "The mere refusal of a trustee to execute an express trust, or the denial of the existence of the trust by him does not make a case for raising a constructive trust." *Ibid;* 1 Beach on Modern Equity Jurisprudence, sec. 234. (8) The plaintiffs do not come into equity with clean hands. They advocated excluding members, and would have done so had they gotten control. (9) A court of equity will not intervene to accord purely social privileges as distinguished from property rights. Froelich v. Musicians' Mutual Ben. Assn., 93 Mo. App. 383; Crutcher v. Order of Railway Conductors, 151 Mo. App. 622.

WILLIAMS, P. J.—This is an action, instituted by twenty-five stockholders of the Glen Echo Country Club, which seeks to set aside a sale of the club's property to the nine individual defendants, or to have a decree declaring that defendants hold said property in trust for the plaintiffs and other stockholders of said club.

Trial was had in the Circuit Court of St. Louis County, which resulted in a decree dismissing plaintiffs' bill. Plaintiffs have duly perfected an appeal to this court.

The voluminous record before us tends to establish the following facts:

The Glen Echo Country Club was incorporated in 1900, under the laws authorizing the incorporation of business corporations. The purpose of the corporation was to own, operate and maintain a golf and country club. Its capital stock was $35,000, divided into three hundred and fifty shares of the par value of $100 each.

In 1905 the corporation purchased, for the sum of $100,000, about one hundred and fifty acres of land lying in St. Louis County, near the corporate limits of the City of St. Louis. Upon this land the club built a club house and a very excellent golf course.

Each member of the club was required to own one share of the stock. The money with which to operate the club was derived from annual dues which each member was required to pay and from charges made to the members for different services. Some years additional assessments were made against the membership for the purpose of making some improvements or to meet some deficiency in the revenue.

Several years before the club property was sold, the club, in order to raise some needed funds, sold to about twenty-five of its members, at the price of $1000 each, certificates, known as "Life Memberships," which exempted the purchasers thereof from payment of dues and assessments during the life of the club. These holders of life certificates are referred to in the testimony as "Perpetual Members."

For several years prior to the sale of the club's property, the business affairs of the club appeared to have been handled in a very loose manner. New certificates of stock in the corporation would be issued to persons who claimed to be the purchasers of outstanding shares of stock and in many instances the old certificates were not surrendered for cancellation. On some occasions the officers of the club neglected to issue shares of stock to persons entitled thereto. Sometimes upon the death of a stockholder, the share of stock would pass into the hands of some one who did not care to use the club. Some of the members failed to pay their annual dues and assessments.

An attempt was made by the club to discipline some of its members for such failure by threatening to refuse them the privilege of the grounds. One of the members who was thus sought to be disciplined brought a suit in the local circuit court to enjoin the club from excluding him from the use of the grounds, and on the theory that the club was a business corporation the circuit court held that the stockholders could not be excluded from the use of the grounds for the failure to pay the annual dues and assessments. The case was appealed to an appellate court, but the final result of the case does not appear in the record.

The club ran behind each year, and in November of 1914 a financial report of the club's treasurer showed its liabilities to total $85,210. Among its liabilities was a $56,000 bonded indebtedness, secured by a deed of trust on the club's property. This bonded indebtedness was to become due on December 27, 1914. On this bonded indebtedness, the club had defaulted on the interest to the amount of $1400. This bonded indebtedness was held by a trust company in the City of St. Louis. Another item was $20,000 evidenced by unsecured promissory notes of the club, held by the same trust company. The notes were payable on demand. At this time the club had on hand $2200 in cash, and there was due the club from its members for unpaid

dues, assessments and accounts the sum of approximately $11,000. Of this amount, $5000 was charged off by the treasurer as doubtful. In the fall of 1914, the property was in need of considerable repairs. The officers of the club were under the impression that they could not discipline the club membership for the non-payment of dues and assessments. It was also charged that the privilege of using the club by non-members was trafficked in by a few of the members. Some considerable dissatisfaction existed among the members concerning the manner in which the club was being conducted.

October 27, 1914, the officers of the club, for the purpose of seeing what could be done for the relief of the club's troubles, gave what was called a ''get-together'' dinner at the club house. Each of the three hundred and fifty members were invited to this free dinner and about forty-eight members attended. The financial conditions of the club were explained to those present, but the stockholders present were unable to agree upon any plan. It was then suggested that the directors formulate a plan for financing the club and call a meeting of the stockholders later.

Pursuant to this suggestion they called a meeting of the stockholders for December 15, 1914. All the stockholders were notified of this meeting and a financial statement was mailed to each stockholder. About thirty-six stockholders attended. At this meeting a committee which had been theretofore appointed by the president to outline plans for financing the club made its report. This committee recommended the following action by the stockholders, to-wit: First, that an assessment of $75 be made against each member of the club for the purpose of liquidating its current liabilities. Second, that the annual dues of the club be increased from $100 to $150 per year. Third, that the club sell 23.4 acres of its land lying west of the Wabash Railroad tracks. Fourth, that a second bond issue be made, sufficient to meet the present requirements of the club,

and that said bond issue be secured by a second deed of trust on the club's property, and the bonds be sold to the club members. All of the foregoing propositions were voted down by the stockholders, and thereupon a motion was made that an entire reorganization of the club be had. This proposition was also rejected by the stockholders. Thereupon a motion was made authorizing the officers of the club to execute and deliver a deed of trust on all of the club property, not included in the first mortgage, this second deed of trust to be given to secure the $20,000 in notes held by the trust company. The trust company was demanding that these notes be secured. This latter proposition was unanimously adopted and the deed of trust was later executed.

About this time, or shortly thereafter, the trust company refused to make loans to the club unless the directors would personally endorse for the club. This the directors declined to do.

After the stockholders' meeting had refused to adopt any substantial part of the plans for financing the club, certain stockholders, including the secretary, of the club, believing that the club would not be able to finance itself and that the club's property would likely be sold under the first mortgage, and in order to meet the contingency of a sale of the club's property, formed what is known in the record as a "Syndicate Agreement." By this agreement, the signers thereof agreed to contribute $1000 each to a fund with which to purchase the club's property in the event the club's property should be sold at public sale. Approximately two hundred persons, including both members and non-members of the club were invited to sign this agreement, and approximately ninety-two of those invited signed the agreement. It does not appear, however, that this agreement was ever used in the purchase of the club's property.

Some of the "perpetual members" heard of the "Syndicate Agreement," and fearing that the club's

property would be sold and their rights as perpetual members jeopardized, called a meeting of the perpetual members January 9, 1915. At this meeting of the perpetual members a committee was appointed to call upon the board of directors to ascertain why the old club should not be continued, and to further see if suitable concessions would be made to the perpetual members if a new club were formed. Some of the perpetual member testified that they had agreed among themselves that they would raise the money with which to finance the club, but no definite plan was at that time agreed upon.

A committee representing the perpetual members called upon the secretary of the club and he requested them to put their proposition in writing. On January 28, 1915, the committee representing the perpetual members wrote a letter addressed to the board of directors, stating that they would be pleased to see the club continued as it then was, and that if the present board of directors "fear that they cannot finance or manage the club under the present conditions, that they resign and permit the perpetual members to attempt to finance and manage the same," and further stated that if the board accepted this proposition the perpetual members would be glad to have any members of the old board join the new board to aid in some manner to run and finance the club upon a sound financial basis.

The secretary of the club replied to this letter, stating that there had been no regular meeting of the directors to discuss the proposition, but that his own view and those of the directors with whom he had talked, was that the proposition was too indefinite to be considered.

Some of the perpetual members then called an informal stockholders meeting, to meet on February 6, 1915. At that meeting a voluntary association of some of the stockholders was formed and is referred to in this record as the "Glen Echo Protective Associa-

tion.'' It was also provided that a committee of ten be appointed by the chairman, which committee should take steps to raise necessary money for the "temporary extension and partial payment of the club's debts," and "to prepare and submit to all the members a plan of reorganization which will take care of every member and preserve the equity and rights of every class of membership."

Upon the request of the members of this committee the directors called a meeting of the stockholders to be held at the Washington Hotel, at eight o'clock p. m., February 15, 1915. At this meeting on February 15, two plans were submitted for the solution of the club's troubles. One plan, having been prepared by the committee of the Protective Association, provided that certain receivership proceedings which had been instituted against the club February 10, 1915, should be vigoriously defended by counsel not connected with the "Syndicate Agreement." (It appears from the evidence that the receivership proceedings were caused to be instituted by the secretary of the club and other stockholders who had been instrumental in promoting the "Syndicate Agreement.") This plan also contemplated that the club's total indebtedness of $85,000 should be taken care of as follows: $60,000 would be obtained as permanent loans, secured by deeds of trust on the club's property; $25,000 to be raised by voluntary loan subscriptions from the stockholders. The committee said that it would raise any part of the $25,000 which the remaining stockholders were unwilling to raise. It was further pointed out that the club's equity in the property was worth $75,000, and that the capital stock should be increased $35,000 and this increased stock should be issued to the subscribers in payment of their loan. It was further recommended that a social club be organized which would lease the club property for a term of ten years at a certain annual rental. Another feature of this plan was as follows:

"Each member of this club has not only social rights incident to club membership, but also property rights, evidenced by his stock ownership. Of the latter he should not be unjustly deprived without compensation; *the former he is not entitled to retain unless he is socially a fit person, and it is entirely within the power of the social organization to determine the social qualities of its members.*

"*So that no inequity may result, provision should also be made that any member of the present corporation excluded from membership in the social organization shall have, in cash, the equitable value of his stock.*" (Italics ours).

Another plan, known as the Thompson plan, was offered at the meeting. This plan provided that the club should go through a receivership proceeding and that the president and treasurer of the old club solicit subscriptions for stock in a new real estate corporation to be incorporated for $125,000 for the purpose of purchasing the club's property at a receivership sale, and that every stockholder in the old club should have a right to own a share of stock in the new real estate corporation; that the *majority* of the stockholders of the real-estate corporation pass a resolution authorizing the leasing of the real estate to a golf club which should be organized under Article 10, Chapter 33, Revised Statutes 1909; that the real estate company first offer to lease the real estate to a golf club organized "*by a majority* of the old members of the Glen Echo Country Club." (Italics ours.) The plan also suggested the terms of the lease and the yearly rental, and provided that after the receivership sale the Glen Echo Country Club should be dissolved. Considerable discussion was had at this meeting, but no definite agreement was reached and the meeting was adjourned to meet again February 23, 1915.

On February 23rd, the stockholders again met and at this meeting a resolution to authorize the officers to enter the appearance of the corporation to the

receivership suit then pending, and to file an answer admitting the allegations of the petition, failed to receive the vote of a majority of the stockholders then present.

There appeared to be two strong factions at this meeting and a resolution, which was in the nature of a compromise between the two factions, was adopted as follows:

"Resolved, That the following committee, H. M. Pflager, C. D. Johnson, James C. Jones, John C. Roberts and E. A. Faust, be appointed a committee with power to take such steps as the majority of the committee may deem best to re-organize this club, adopting so much of Mr. Thompson's plan as may be necessary or advisable."

The above resolution was carried by a vote of 211 for and 1 against. Seventy-six stockholders were present in person; the remaining votes were cast by proxies.

Two members of the above committee were friendly to the views held by the perpetual members and the Glen Echo Protective Association. Two of the members were friendly to the "Syndicate Agreement" faction and the fifth member was thought to be neutral. This committee for the sake of brevity will hereinafter be referred to as the "Committee of Five."

After the appointment of this Committee of Five, the committee theretofore appointed by the perpetual members and the Committee of Ten, appointed by the Protective Association, ceased to function and threw their influence back of the Committee of Five.

The Committee of Five thereafter organized and employed an able attorney to advise them, the attorney employed having no connection whatever with the Glen Echo Country Club. The counsel so employed was requested by the committee to go into the affairs of the club fully and to suggest to the committee a solution of the club's troubles. The counsel employed reported to the committee that he had examined into

the matter and talked to different members of the club, had examined the club's charter, and that it was his opinion that under the law any reorganization of the old club must necessarily entitle every member to be recognized equally with every other member in the reorganization; that if this were done a large part of the membership would refuse to come in because some of the old members were permitted to come in. In other words, he was of the opinion that it would be impossible to get all of the old stockholders to agree on a plan of reorganization. The counsel therefore advised the committee that the only practical solution of the club's troubles was to have a real dissolution of the old club, sell its property at public sale to the highest bidder for cash, pay the club's debts, distribute the remainder among its members and procure a statutory dissolution of the old corporation.

The question as to the rights of the perpetual members in the assets of the old club, if its property should be sold, was one which was constantly coming up throughout this entire controversy, both before and after the appointment of the Committee of Five. The committee therefore requested the counsel to employ expert accountants and to ascertain, first, who were the real stockholders of the club, and, second, the values of the equity of the so-called perpetual memberships. This was done and the expert accountant reported that the equity of each perpetual member was worth $385.27.

On March 31, 1915, the Committee of Five mailed to each member of the Glen Echo Country Club the following letter:

St. Louis, March 31, 1915.

To the Members of the Glen Echo Country Club:

Your committee submits herewith, first, a plan for dissolution of the Glen Echo Country Club; second, a tentative plan for the organization of a new club.

Enclosed find:

1. Form (A). Plan for dissolution of old club.

2. Form (B). Resolution to be voted in favor of said dissolution.

3. Form (C). Proxy to vote in favor of said resolution.

·4. Form (D). Receipt for stock.

5. Form (E). Tentative plan for organization of a new club.

6. Form (F). Request on the proposition to organize a new club.

The plan for the dissolution of the present Glen Echo Country Club contemplates a public sale of all the property of the present club for the best price obtainable, a distribution of the proceeds of such sale among the present members on an equitable basis, and the final dissolution of the present corporation.

The plan submitted in its various details does not have the entire approval of all of the members of the committee, but each member of the committee has concluded to recommend it to the members of the club as the, best course that can adopted in the circumstances that confront us.

Whatever is done should be promptly done, as delay will result in loss, deterioration of the property and postponed enjoyment of it. Everything is now at a standstill, *so respond at once.* Vote on every proposition as you want, but *vote*, and return immediately to the undersigned.

H. M. PFLAGER,

E. A. FAUST,

C. D. JOHNSON,

JAMES C. JONES,

JOHN C. ROBERTS,

Committee.

"Respond in enclosed stamped envelope."

"Form (A)" enclosed in the foregoing letter was as follows:

Form (A).

*Plan for the Dissolution of the Present Glen Echo Country Club.*

Whereas, the Glen Echo Country Club is indebted to various persons in various amounts as appears by the following:

| | |
|---|---:|
| Part of a bond issue of $60,000 due the Mississippi Valley Trust Co. secured by first mortgage on the land and buildings of the Glen Echo Country Club, amounting to | $60,000.00 |
| Interest on same to December 27, 1914 | 1,400.00 |
| Accrued interest on same after maturity at the rate of 8 per cent per annum to March 15, 1915 | 970.32 |
| Taxes due December 31, 1914 | 1,202.00 |
| Penalties on same at the rate of 1 per cent per month to March 15, 1915 | 85.00 |
| Notes at the Mississippi Valley Trust Co. bearing 6 per cent interest, secured by chattel and real deed of trust | 20,000.00 |
| Bills due for labor and supplies to April 1, 1915 | 1,000.00 |

(The daily expense is about $150. Last year the deficit was $6,271.07.)

And, Whereas, all of said obligations are past due, and the club is in default regarding the same; and, whereas, the only sources of income are from dues and assessments from its members; and, whereas, they are insufficient to meet the above obligations, or, in fact, to pay the current expenses of the club; and, whereas, a large number of the members have refused and declined to pay dues and assessments; and, whereas, a suit has been instituted and is now pending in the circuit court of St. Louis County, Missouri. for the appointment of a receiver; and, whereas, there is an irreconcilable divergence of views among the members as to the method of conducting and carrying on the affairs of the Glen Echo Country Club, your committee is of the opinion that said club should be dissolved.

The property should be sold as soon as possible at public sale to the highest bidder, after being appraised and after twenty days' published notice the debts paid, and the residue, if any, divided among the stockholders.

In view of the fact that certain stockholders have heretofore purchased from the club exemptions from dues and others have not, it would seem fitting that said first mentioned stockholders should be favored to the amount of the excess paid by them to the club. In this belief the committee has had the equity of said exemption holders calculated by Price, Waterhouse & Company, certified public accountants, and they report that it amounts to $385.27. This should be given to said exemption holders out of the net assets, if any, available for distribution, after payment of debts and expenses. The remainder, if any, should be distributed equally among all the stockholders, including exemption holders, deducting from any stockholder's share any liability to the club for dues, assessments, supplies, fines or penalties or any account whatever.

As an illustration of what the stockholders may expect if the property shall sell for $120,000, each share of ordinary stock will be alloted about $60 per share. If the property sells for $140,000, each share of ordinary stock will be allotted about $120 per share.

Dissolution.

The Club can be dissolved if the holders of two-thirds of the stock so vote in a meeting duly assembled for that purpose.

It is not necessary for the sale to await the dissolution of the club, as that can be effected subsequently.

To effect the proposed sale and subsequent dissolution of the present club, it will be necessary for the. club at a special meeting called for that purpose to pass the proper resolution authorizing such sale and dissolution. To this end there is enclosed herewith:

1. A resolution to be offered at a special meeting of the

277 Mo.—10

stockholders, authorizing sale and distribution of the property of the club and dissolution of the corporation.

2. A proxy authorizing this committee or any of its members to vote in favor of said resolution at said meeting.

If you are in favor of such dissolution, sign and return to the undersigned chairman the enclosed proxy, and endorse, in the presence of a witness, your certificate of stock, and also send this to the committee in the enclosed stamped envelope.

The special meeting will have to be called at the club for 9 a. m., on the day to be selected, as it is necessary under the law that the formal meeting be held at that hour and place.

On receipt of favorable replies from two-thirds of the stockholders, a meeting will be called and notice given.

H. M. PFLAGER, Chairman.
E. A. FAUST,
C. D. JOHNSON,
JAMES C. JONES,
JOHN C. ROBERTS."

"Form (B)" enclosed in the foregoing letter was a resolution authorizing the directors to have all of the property of said club sold at public sale to the highest bidder for cash, and directed that the proceeds of such sale should be applied to the payment of the expenses of said sale, payment of the debts of the corporation, payment of the costs of dissolving the corporation, the payment of $385.27 to each of the perpetual members, and the residue to be distributed equally among all the shareholders, including shares held by perpetual members. This resolution also provided for a statutory dissolution of the corporation and authorized the directors to take the necessary court action to that end.

On the back of "Form B," was printed "Form C" which was a proxy for each shareholder to sign if he so desired. This proxy when signed authorized the Committee of Five to vote said proxy at a stockholders' meeting in favor of said resolution.

"Form D" was a form of receipt which the committee promised to send to every stockholder who would send in his share of stock.

"Form E" enclosed in said letter was as follows:

Form E.
### Tentative Plan for a New Club.

It has been suggested that a new golf and country club be organized along the following lines:

1.  Said club to be organized as a social club under Chapter 33, Article X, Revised Statutes of Missouri of 1909, and acts amendatory thereof, relating to "Benevolent, Religious, Scientific, Educational and Miscellaneous Associations."

2.  Said club to have a membership of not more than four hundred Regular Members.

3.  There are to be five classes of members: Regular Members, who shall have the power to vote; Junior, Associate, Non-resident and Honorary Members, who shall enjoy all the privileges of the club, but have no power to vote; Junior Members to be unmarried and between twenty-one and thirty years of age; Associate Members to be officers of the Army and Navy; Non-resident Members, persons who live more than fifty miles from the City of St. Louis; Honorary Members, Ministers of the Gospel. Ladies and minor children of a member's family shall be entitled to the privileges of the clubhouse and grounds.

The initiation fee of Regular Members to be four hundred dollars, with proviso that on the retirement, suspension or death of a Regular Member, and the re-election of a new member in his place, fifty per cent of the initiation fee received from the new member to be paid to the retiring member or his estate. Associate and Honorary Members to pay an enrollment fee of one hundred dollars.

Dues of Regular, Junior and Associate Members to be not more than one hundred dollars a year; Non-resident Members, fifty dollars a year; Honorary Members, fifty dollars a year. Sons of Active Members of the club between the ages of twenty-one and thirty years of age, on the payment of fifty dollars initiation and fifty dollars a year, shall be entitled to enjoy the privileges of the club, but shall not be entitled to vote.

No Memberships of any kind to be transferable.

The club to be governed by a Board of Nine Directors, three of whom shall be elected each year to serve three years and until their successors are elected. Of the first Board of Directors, three are to serve until November, 1916, three until November, 1917, and three until November, 1918. The Directors shall elect from their number a president, two vice-presidents, secretary and treasurer, provided the office of secretary and treasurer may be held by the same person, to serve until November, 1916, and until their successors are elected. The officers and remaining directors shall be known as the "Board of Governors", and shall exercise such powers and perform such duties as usually attach to their respective offices. The Board of Governors are to make the by-laws with power to amend or repeal the same not inconsistent with by-laws made by the members.

The club to have the right to buy, lease, rent and otherwise acquire, and to sell, mortgage and pledge property, both real, personal and mixed, for the legitimate purposes of the club, said power to be exercised by the Board of Governors until the first election of directors by the club, and thereafter by the Board of Governors under direction and authority of the association or club.

The club to have the right to pass on the qualifications of its members and to suspend or expel its members for cause.

The club to have the right to provide and maintain golf course, polo grounds, tennis courts, clubhouse, stables and other proper and necessary appurtenances of a country club.

Members to vote in person or by proxy.

If you are in favor of the undersigned organizing such a club, doing the necessary things therefor, and selecting the Board of Governors, sign the enclosed request and authority for them to do so, *and if two hundred or more requests are received to this effect, they will set about carrying out said plan,* it being understood that none of the undersigned will be named on said initial board.

*It is distinctly understood that the undersigned are not proposing to form a new country club and are not soliciting applications for a country club, and that the above is no more than a willingness to serve on the unsolicited request of each person signifying his desire that the undersigned act. It is also distinctly understood that the signing and forwarding of such a request to the undersigned is no assurance that the person so forwarding a request will be admitted to the club, if formed, and the undersigned give no such assurance and do not obligate themselves or assume any responsibility for a new club, if formed, or that any requestor will be accepted in said new club, if one is formed.* (Italics our).

"Form E" was signed by each member of the Committee of Five.

"Form F" enclosed in the letter was a printed form addressed to the Committee of Five whereby each stockholder by signing the same could express the approval of the plan for forming a new club; and it stated that the signer signified his desire to join such club and "if elected" the signer agreed to pay the fees and abide the regulations of the new club.

Replies began to come in from the stockholders after the above documents were sent out, and on May 1, 1915 (more than two-thirds of the stockholders hav-

ing approved the plan for sale of the club property and
the dissolution of the club), the Committee of Five re-
quested the board of directors to call a stockholders'
meeting for the purpose of voting on the above propo-
sition which had been submitted to the individual stock-
holders.

The board of directors thereupon called a meeting
of the stockholders for May 22, 1915. At this stock-
holders' meeting the resolution to sell the club's
property and dissolve the corporation, being the same
resolution contained in "Form B," was adopted by the
stockholders; 271 stockholders voting for the reso-
lution, and 2 stockholders voting against the resolution.
Among those voting for the resolution were 268 stock-
holders represented by proxies, who had returned
their signed proxies to the Committee of Five in re-
sponse to the letter which the Committee of Five had
sent the stockholders on March 31st.

It further appears from the evidence *that only
115* of the stockholders signed "Form F," requesting
the Committee of Five to organize a new club.

On June 3, 1915, the board of directors at a meet-
ing duly called passed resolutions directing the officers
of the company to carry out the resolution which had
been adopted by the stockholders. The officers of the
company, following a suggestion which had been made
by the Committee of Five, employed three disinterested
and responsible real-estate men of the City of St. Louis
to appraise the club's property prior to the sale. The
three appraisers appraised the property at $125,840.

Notices of the sale were duly published and the
sale occurred on July 10, 1915. A week or ten days
prior to the sale the president of the corporation caused
to be posted on the bulletin board at the club house
and in other public places upon the premises, notices,
notifying the members of the club that upon the con-
sumation of the sale of the property on July 10th, 1915,
"the members of the club will cease to have any rights
in the property; . . . members must arrange to re-

move all of their property from the club house, as it is only through the courtesy of the purchasers that they can remain after the purchase of the club house and grounds.''

The sale was conducted at the club house by a disinterested and competent public auctioneer and the property was sold for $131,288.65. The property was bid in by defendant Lambert, bidding for himself and eight associates, the nine purchasers being the first named nine individual defendants in this suit.

The purchase price was paid and after the mortgage indebtedness was paid the balance, to-wit, $48,172.25, was deposited by the club's officers in a local bank to the credit of the Glen Echo Country Club.

Several people attended the sale. Mr. Buder, one of the ''perpetual members'' and who appears to have been interested, at least, in protecting the *financial* rights of all the members, appeared at the sale and inquired of Mr. Lambert and his crowd if they were going to bid the property in for all of the old club members. On being informed that they were not, Mr. Buder replied that under those conditions he would bid the property in for all the club members if they wanted to come in. Mr. Buder and Mr. Lambert were the only bidders at the sale. After the sale Mr. Buder appeared to be satisfied, because of the fact that the property had brought enough so that the old stockholders would be paid par for their stock and enough would remain out of which the perpetual stockholders would be paid the sum fixed by the expert accountants.

It appears from the evidence that the Committee of Five, if requested by as many as two hundred of the old stockholders, had in contemplation a plan of organizing a new club under Chapter 33, Article 10, Revised Statutes 1909, relating to ''benevolent, religious, scientific, and educational associations.'' Some time during the latter part of May, 1915, however, the counsel for the Committee discovered the case of

Prairie Slough Fishing & Hunting Club v. Kessler, 252 Mo. 424, and after reading that opinion, entertained much doubt as to the power of a corporation organized under that act to acquire and hold the real estate needed for a club of this kind, and recommended in lieu thereof a plan known as the "Massachusetts Land Trust," under which plan the property would be held and controlled by trustees.

Later, when it was definitely known that there would not be two hundred requests from the old stockholders for the organization of a new club, discussion arose in the Committee of Five as to what they should do. The committee's counsel advised them that there was no way by which the committee could hold even the 115 stockholders who had requested the organization of a new club, because by the terms contained in the literature which had been sent out to the stockholders, the offer to organize a new club was contingent upon at least 200 stockholders signing a written request for the same. After discussing the matter the members of the Committee of Five concluded that they had no authority from the stockholders to organize a new club.

The members of the committee, however, as individuals were desirous of having a new club organized, and for the purpose of forming a plan of their own decided to invite four other gentlemen to join with them in the purchase of the property, and if they were successful in purchasing the property they would attempt to organize a new club upon their own responsibility. Four additional men, upon invitation, agreed to join with the five, and arrangement was made to raise the money with which to purchase the property. This was done by each of the nine men signing a note at a local bank. It appears from the evidence of Mr. Jones, one of the Committee of Five, that he did not attend many of the meetings held by the Committee of Five during the month of June, 1915.

Immediately after the sale the property was conveyed to the nine purchasers, "as Trustees of the New Glen Echo Club."

Two days after the purchase the nine purchasers met for the purpose of perfecting the organization of a new club under the "land trust" plan. At this meeting the question arose as to how they would determine who would be invited into the new membership. Mr Lambert who, by agreement among the purchasers, had been chosen president of the new club, produced a list of names. In this list were the names of the greater number of the members of the old club (if not all) and many new names. It was finally decided by the nine purchasers (Mr. Jones and Mr. Lambert voting to the contrary) that each of the nine purchasers should take one of these lists and go over the names and when he came to a name of any person whom he did not desire to have immediately invited to join the new club he should put a check mark opposite such name. It was agreed that the further consideration of all those names which received as many as two check marks should be postponed to some future date and the other names upon the list should be immediately invited to join the new club. Mr. Jones demurred to this action, contending that they should at once invite all the members of the old club to become members of the new club.

In a few days thereafter Mr. Jones resigned as a trustee, and he was relieved of his obligations under the purchase.

It appears from the evidence that newspaper publicity was given to this list with the check marks on it, and thereafter some of the stockholders of the old club organized a litigation committee and this suit resulted.

After the sale of the property the officers of the old club, under the authority of the meeting of stockholders and of the board of directors (more than two-thirds of the stockholders having voted in favor there-

of), instituted in the Circuit Court of St. Louis County a proceeding under the statutes to dissolve the old corporation. The final determination of the dissolution proceeding was stayed to await the result of this suit.

Each of the twenty-five plaintiffs in this suit voted either in person or by proxy for the plan providing for a sale of the old club's property and dissolution of the corporation. About sixteen of the plaintiffs sent in written requests to the Committee of Five for the organization of a new club, and it appears that a few of the plaintiffs were requested by the defendants to join the new club, but the greater number of the plaintiffs had not been so invited at the time this suit was instituted.

Appellants contend that the court erred in refusing to decree that the defendants purchased the property of the Glen Echo Country Club as trustees for the club and its members.

Trustees.

In the above behalf it is insisted that five of the defendants were appointed by the stockholders as a "Committee of Five" to reorganize the club; that by reason of such appointment a fiduciary relation existed between the defendants and the Glen Echo Country Club and its members; that the subsequent purchase of the club's property at the public sale by defendants (five of whom were members of the Committee of Five), was a violation of said fiduciary relation, and that the property so purchased should now be charged with a trust in favor of the club and its members. In support of their contention the appellants cite cases of which the following are fair types: Life Ins. Co. v. Smith, 117 Mo. 261, l. c. 295; Grumley v. Webb, 44 Mo. 444, l. c. 451.

We have no fault to find with the legal principles announced by appellants and by the cases cited, but after a very careful and painstaking examination of the evidence offered upon the trial, we are unable to discover facts sufficient to call for the application in the instant case of the rule announced.

On March 31, 1915, over three months prior to the public sale of the property by the duly authorized officers of the club, the five defendants comprising the Committee of Five made a full and detailed report to each member of the club, asking each member to make a written return indicating his views upon the solution of the club's troubles. More than two-thirds of the stockholders (including all of the plaintiffs) sent in their proxies authorizing their respective votes to be cast in favor of the very sale of the club's property which was afterwards in fact made, and further authorizing a statutory dissolution of the corporation and a distribution of its assets. It must not be overlooked that this resolution which was authorized by these very plaintiffs provided for a *public sale of the property for cash to the highest bidder.* At the time this report was sent to the stockholders, the Committee of Five also enclosed a ''Tentative Plan for Organization of a New Club,'' asking those stockholders, who desired to obligate themselves to apply for membership in a new club, to signify their desire by signing and returning a printed request therewith enclosed. This Tentative Plan contained among other things the following:

''If you are in favor of the undersigned organizing such a club, doing the necessary things therefor, and selecting the Board of Governors, sign the enclosed request and authority for them to do so, *and if two hundred or more requests are received to this effect, they will set about carrying out said plan,* it being understood that none of the undersigned will be named on said initial board.

''*It is distinctly understood that the undersigned are not proposing to form a new country club, and are not soliciting applications for a country club, and that the above is no more than a willingness to serve on the unsolicited request of each person signifying his desire that the undersigned act. It is also distinctly understood that the signing and forwarding of such a*

*request to the undersigned is no assurance that the person so forwarding a request will be admitted to the club, if formed, and the undersigned give no such assusance and do not obligate themselves or assume any responsibility for a new club, if formed, or that any requestor will be accepted in said new club, if one is formed."* (Italics ours.)

From the foregoing it is clearly apparent that the Committee of Five were not at that time acting as the trusted agents of the members of the club for the purpose of procuring the club's property, and the organization of a new club, but the very purpose of that communication was to ascertain if a sufficient number of the old membership desired to confer a portion of that power upon the committee. The committee in clear language told the stockholders that if as many as two hundred of their number signed such written requests they would set about carrying out said plan. Only 115 of the members, however, sent in their requests for a new organization.

Under the terms of the proposition made it therefore clearly appears that neither the defendants nor any of them ever became the agent of all the stockholders or of any of the stockholders for the purpose of purchasing the property or organizing a new club. And even though two hundred members had sent in their written request for the organization of a new club under the terms proposed in the Tentative Plan, it would have strained the powers of a court of equity to have been able to ascertain what specific stockholders, if any (absent more specific provisions), would have had the right to demand the privilege of becoming a member of the new organization, this because the very plan proposed provided that "it is also distinctly understood that the signing and forwarding of such a request to the undersigned is no assurance that the person so forwarding a request will be admitted to the club if formed."

The reason for this provision becomes very apparent from a reading of the record. Hostile factions had developed in the club. None of the plans presented by the different factions at any time contemplated that *all* of the members of the Glen Echo Country Club should be permitted to join any new club or organization which might thereafter be formed for the purpose of conducting a golf club on said property.

The existence of factionalism and lack of harmony among the members of the old club were no doubt the important factors which induced the stockholders to vote for a sale of the property and a dissolution of the old club.

The notice of sale was properly advertised in the press, and notices were posted at several conspicuous places on the club grounds. By these notices, and the resolution which the stockholders had themselves adopted, they were clearly informed that this was to be a public sale to the highest bidder for cash, and that after the sale the members of the club would "cease to have any rights in the property."

The Committee of Five would no doubt have displayed a wiser discretion in the matter, and one less likely to have produced subsequent litigation, had they sent each stockholder a written notice that the requisite two hundred had not requested an organization of a new club, but, absent a showing that such failure caused the plaintiffs to be misled, or that such failure was occasioned by bad faith upon the part of the committee, we are unable to see wherein such failure can affect the result of this case. Nothing appears to have been concealed from the stockholders by the committee and each faction of the club was ably represented upon said committee.

We are convinced by the evidence that the defendants as individuals acted in good faith in purchasing the property, and that they purchased the property upon their own responsibility, because they were not authorized to purchase it for any one else. Nor are we

able to discover any duty owed by the defendants, or any of them, to the stockholders which was inconsistent with the right of defendants to become purchasers at the public sale of the property.

We are therefore unable to discover any facts in this record which would justify a court of equity in decreeing that plaintiffs have any rights in the property purchased by defendants and for that reason we are of the opinion the judgment dismissing the plaintiff's bill should be affirmed.

It is so ordered. All concur.